BETTS *vs.* JACKSON, *ex dem.* J. BROWN, and others.

Where a will was duly executed, and in the custody of the testator for five years afterwards, and within *ten months* previous to his decease, but could not be found after his decease ; *it was held* that the legal presumption was that the *testator* had destroyed it *animo revocandi*, although it appeared that within a fortnight before his death he applied to a scrivener who had drawn a codicil, to draw *another codicil to his will*, which however was not drawn, nor was the will at the time produced to the scrivener. The will in this case was made in 1816 ; of course not affected by the *Revised Statutes*.

A duplicate *will* in the hands of a third person would, *it seems*, under such circumstances, be considered equally void.

The declarations of a testator in his last sickness are admissible evidence, to strengthen or repel the presumption that a will once legally executed but not found at the death of the testator had been destroyed by him. Per Chancellor WALWORTH.

Evidence of the relative situation in point of property of the children of a testator is inadmissible in support of the presumption of a revocation of a will, where there is no change in the circumstances of the children between the making of the will and the time of the alleged revocation.

A plaintiff in ejectment may be sworn on the trial of a cause to prove search made for a will under which he claims, but beyond that he is not permitted to state any thing.

ERROR from the supreme court. In 1816, Benajah Brown made his will, and by it devised the whole of his real and personal estate to six *sons*, he having at the time six sons, six daughters and one grandson ; charging his estate with the payment of $200 to each of his daughters, and of a like sum to his grandson. In 1821, he made a codicil to his will, by which an alteration was made in the disposition of the property, so that the shares of two of his sons were given to a *trustee* for their use. The codicil was duly executed, attached to the will and taken by Brown. Brown resided in the county of Rensselaer ; in the month of May, 1822, he went to pay a visit to several of his children, who resided in the county of *Westchester*. Whilst there he called on the individual who had written the codicil for him in 1821, and requested him to draw *another codicil to his will*, but did not produce his will. The codicil was not drawn, and the next day the decedent sickened, and about two weeks afterwards died. No will was found about the person or ef-

fects of the decedent, nor at his residence; his desk was searched, where notes, deeds and other valuable papers were found, but no will. The decedent was a widower, and for about two years previous to his death one of his daughters, (Nancy Ayres,) had resided with him; a grandson, (son of the defendant,) had also resided with him for some time previous to his death. When Mrs. Ayres was informed of the sickness of her father, she went to, remained with and took care of him until his death. Mrs. Ayres testified that her father died about three weeks after he left home; that he kept his papers in a desk; that a short time previous to his leaving home she observed him take something from his desk which appeared to her like papers; he seemed to be sly about it, and was going to Troy. Before he left home for Westchester he was very attentive to the arrangement of his papers; she saw him once or twice burn papers which he took from his desk, and when he went away he took a bundle of papers with him. He was 72 years old. Two of the lessors of the plaintiff were sworn, although objected to by the defendant; one stated the search made for the will in Westchester and at the residence of the decedent; the other, that whilst his father lay sick he examined his trunk, and found two or three loose papers in it, but no will.

The above facts appeared on the trial of an action of eject-ment, brought by three of the sons, claiming as devisees under the will of 1816, against the husband of one of the daughters, who was in possession of part of the real estate of the decedent, and who entered into a *special* consent rule, claiming an interest in the premises as a tenant in common. The cause was tried at the Rensselaer circuit, before the Hon. JOHN WOODWORTH, then one of the justices of the supreme court. On the trial of the cause it was offered to be proved that one of the daughters of the decedent was at the time of his death the mother of a large family of children, and that she and her husband were wholly unable to support them; the relative situation of the other children of the decedent, in point of property, was also offered to be shewn. This evidence was objected to by the plaintiff, and overruled by the judge, who, after the testimo-

ny was closed, decided and declared the law to be that if the will was duly executed, and once an existing will, and in the hands of the testator, unless there be evidence of its having been cancelled or revoked by the testator, the law presumes its continued existence to the death of the testator; that the facts proved by the defendant were not sufficient in judgment of law to warrant the inferencce that the will had been cancelled or destroyed by the testator, or to justify the jury in finding that the testator revoked his will, and that he should so state the law to them; and that the counsel for the defendant could not be permitted to argue to the jury that those facts alone would justify them to find that the will had been revoked.   To which opinion and decisions the counsel for the defendant excepted.   The jury found for the plaintiff.   The defendant applied to the supreme court for a new trial, which was refused.   (See the reasons of the supreme court, 9 *Cowen*, 208.)   Whereupon the defendant sued out his writ of error.

ALBANY,
Dec. 1830.

Betts
v.
Jackson.

The cause here was argued by

*J. Paine & B. F. Butler*, for the plaintiff in error.

*J. P. Cushman*, for the defendant in error.

The following opinions were delivered :

By the CHANCELLOR.   Before I proceed to the examination of the more important questions in this cause, it may be proper briefly to notice the objection to a decision of the judge, as to the admissibility of evidence to prove the situation of the testator's children as to property at the time of his death.

Wherever a doubt is raised by the evidence as to the mental capacity of the testator, or as to the exercise of undue influence in obtaining a testamentary disposition of the property of a man whose mind is weakened, or rendered imbecile by age or disease, the reasonableness of the will in relation to those who are the natural objects of the testator's bounty, is a proper subject for the consideration of the court or jury, in determining whether it was made by him while in the full possession of his mental faculties, as a free and voluntary

act, or was obtained by fraud or undue influence. *5 Serg. & Rawle,* 207. 6 *id.* 56. 13 *id.* 323. So I apprehend on a question of revocation arising from an equivocal act of a a testator leaving it doubtful whether the act was done *animo revocandi,* or where the will cannot be found at the testator's death, the party claiming in opposition to the will may give evidence of such a change in property of the testator, or in the situation of his family, as might have furnished a reasonable motive for the revocation. Thus in *Loxley* v. *Jackson,* 3 *Phil. Rep.* 128, the testatrix made a will, by which she gave the bulk of her property to a nephew. Finding afterwards that he was living in adultery with a servant girl, she secretly made a new will, giving most of her property to others. At her death the last will · was not to be found ; and the nephew was permitted to give evidence that, after the making of the last will, the testatrix had ascertained that he had discarded the servant girl and abandoned his dissolute habits ; to strengthen the presumption that the testatrix had destroyed the last will for the purpose of reviving the first in his favor. The same principle is recognized in *Richards* v. *Mumford,* 2 *Phil. Rep.* 25. So on the other hand in *Mynn* v. *Robinson,* 2 *Hagg. Eccl. Rep.* 179, on a question as to the validity of a will made by the testatrix shortly before her death and while in a state of extreme debility, the fact that no material change had taken place in her circumstances or in the situation of her family to induce her to alter a testamentary disposition of her property deliberately made, was held by Sir J. Nicholl a strong circumstance in favor of the presumption that the last will was obtained by undue influence. But here the counsel for Betts did not offer to show any change in the relative situation of the children of the decedent, as to property, after the making of the will and codicil ; or that the same reasons which had originally induced him deliberately to reject the claims of a part of his children on his bounty, did not continue to operate upon his mind down to the time of his death. The judge therefore very properly rejected the evidence of the poverty of one of the daughters, and her numerous family. It was merely calculated to enlist the sympathies of the jury in her favor ; and thus to mislead their

judgments in relation to the only questions in issue between the parties.

If the decision of the judge was right on the question of presumption, the evidence of the *lessors* of the plaintiff was properly admitted to show that they had searched in the usual places for the will, after the testator's death, and that it could not be found, for the purpose of letting in secondary evidence of its contents. One of those witnesses was permitted to testify that he examined the trunk in the testator's lifetime, and that the will was not there. So far as this went to rebut the presumption, raised by the evidence of Mrs. Ayres, that the will was taken away from Brunswick by the testator, it was improper, and should not have been stated in the presence of the jury. All the party should have been permitted to say on this subject was that he knew not what had become of the will; that the trunk was in his possession at the death of his father, and that the will was not in it at that time. This was all that was necessary or proper, unless the adverse party chose to examine him more particularly as to the fact of the existence of the paper after that time. But this specific objection does not appear to have been taken at the trial. The plaintiff's lessor, W. Brown, was offered for the purpose of proving a search for the will ; and before he was sworn the defendant's counsel objected that he was an incompetent witness for that purpose. I must presume that if he had been offered as a witness to prove a search for the will in that trunk before the death of the testator, the judge would not have received the testimony; but he was a competent witness to give evidence to the court that the trunk was in his possession at the death of the testator, and that the will was not in it at that time, as from the testimony of Mrs. Ayres it became necessary to show that the trunk had been examined, otherwise it might be presumed still to be there.

The real questions in this cause are, 1st. Is the presumption of law such as stated by the judge, that the will duly executed and left in the possession of the testator, and not found after his decease, is presumed to have continued in existence until his death, unless there be other evidence of its

having been cancelled or revoked by the decedent? and 2d. If such is the legal presumption, was there in this case evidence sufficient to rebut that presumption, or to have justified the jury in finding a verdict for the defendant, on the supposition that the will had been cancelled or destroyed by the testator? If the plaintiff in error is right on either of these points, the judgment must be reversed and a *venire de novo* awarded, so that the jury may pass upon the facts under a proper charge from the court.

The first point is no longer important in relation to future wills. The revised statutes have declared the rule as to the wills of all persons dying after those statutes went into operation. To admit any such will to proof as a lost or destroyed will, the party claiming under it must prove the fact of its existence at the time of the testator's death, or show that it was fraudulently destroyed in his lifetime.  2 *R. S.* 68, § 67. But as the statute could not with propriety be extended back so as to cover those cases where individual rights had become vested by devise or descent, the titles to many valuable estates may depend upon the correctness of the decision we are about to make.

The case principally relied upon by the judge who tried this cause, and who subsequently delivered the opinion of the supreme court, is *Goodright ex dem. Rolf and wife* v. *Harwood, reported in* 3 *Wils.* 497; *Cowp.* 37; 2 *Wm. Black,* 937; *Lofft's Rep.* 282, 558; and 7 *Brown's P. C.* 344. To understand that case, and the extent of the principle contained in the decision, it may be necessary to refer briefly to the facts. The wife of Rolfe, the lessor of the plaintiff, was the heir at law of I. Lacy, who died in 1667, seized and possessed of considerable estate both real and personal, and including the premises for which that suit was brought. The defendant claimed the premises under a will of Lacy duly executed in 1748, which must have been produced at the trial, as it is set out at length in the special verdict. By this will all the real and personal estate of Lacy was devised and bequeathed to the defendant in fee, charged with the payment of certain legacies. The plaintiff claimed to recover on the ground that this devise was revoked by a subsequent

will, executed in 1756; which was not produced at the trial in 1772, five years after the death of the testator. In relation to this will the jury found that it was duly executed by the testator in the presence of three witnesses, and that the disposition made of the property by that will was different from the disposition made thereof by the will of 1748; but in what particulars was unknown to the jury. They further stated in their verdict that they did not find that the testator cancelled the will of 1756, or that the defendant destroyed it; but that they were altogether ignorant as to what had become of that will. A majority of the judges in the court of common pleas decided that the last will was a revocation of the first, and as the contents of the last will could not be ascertained, the heir at law was entitled to recover. On a writ of error to the king's bench the judgment of the common pleas was unanimously reversed. This last decision was afterwards confirmed by the house of lords, after taking the opinions of the barons of the exchequer, and the defendant was permitted to hold the premises in question under the first will. If that case turned upon the question whether the last will was presumed to have continued in existence until the death of the testator, it is a most conclusive decision against that presumption, and having been decided before the revolution it would be binding on us here, and the judgment of the supreme court must of course be reversed; but, so far as I can understand the case, it turned upon an entirely different question, and although it was five times elaborately argued, the counsel on both sides seem to have paid very little attention to the question, whether from the special verdict the last will was to be presumed in existence at the testator's death. The real question, and the one on which the cause was decided in all the courts, was whether the finding of the jury that a subsequent will was made different from the first, but in what particulars was unknown, was a revocation of the first. The common pleas held that the devisee under the first will was bound to produce the last, and show that it was not inconsistent with and a revocation of the devise as to the particular property for which that suit was brought; but the higher courts decided that the defendant

had shown the property out of the heir at law by the first will; and it was therefore incumbent on the plaintiffs to show such a will as would be a valid revocation of this particular devise. It is true, Mr. Justice Nares of the common pleas says, incidentally: "Here is a second will in writing found to be different from the first, which second will is not found to be cancelled or destroyed; therefore it must be considered as in being." But on the other hand Lord Mansfield says: "It has been settled that if a man by a second will even revoke a former, yet if he keep the first will undestroyed, and afterwards destroy the second, the first will is revived. In this case the jury do not say a syllable as to the second will being *in esse* at the time of the testator's death." It is therefore evident the question of presumption, which we are considering, was not raised by the special verdict there; it does not appear whether there was or was not evidence that the last will was left in the hands of the testator; I therefore conclude that there is nothing in the case of *Goodright* v. *Harwood* which ought to influence our judgment either way in this case.

There can be no possible doubt as to the validity of a will or codicil duly executed, although it be destroyed in the lifetime of the testator, if so destroyed by fraud or mistake and without his consent. And if it was not intended to be destroyed by him, and is actually *in esse* at the time of his death, the rights of the legatees or devisees under the will cannot be changed by any loss, destruction or suppression of the testamentary paper provided the contents thereof can be sufficiently ascertained to preserve and enforce those rights in a court of justice. Even where the exact contents of a will cannot be ascertained, if it has been suppressed or destroyed by a person interested in opposition thereto, the court or jury *in odium spoliatoris* will be authorized to presume many things as against the party who has been guilty of the fraudulent act. Here the will was last seen in the possession of the testator, and it is proved that it could not be found immediately after his death. Is then the presumption a reasonable one, that the testator, who had a perfect right to destroy the will, and who had no interest to keep it if he changed his mind as to

ALBANY,
Dec. 1830.

Betts
v.
Jackson.

the disposition of his property, has done the act; or is it more reasonable to suppose it has been done by some other person, in fraud of the rights of the devisees, and by perpetrating a crime which the law abhors?

I confess I cannot perceive the analogy between this case and that of a lost deed or other paper in which the depositary has an interest in its preservation. After the will had been consummated by the death of the testator, if it was subsequently lost by a party who had an interest in preserving it, the analogy would hold. The law will not presume that a man has acted directly in opposition to his interest, and therefore where he has in his possession a paper which is the evidence of his right, and it cannot be found after his death, the law presumes it was lost by accident, or spoliated by some one who had an interest to destroy it; but it is every day's practice to presume the destruction of notes and bonds which have been paid and taken up, and which the obligor, in whose possession they last were seen, had no longer any interest in preserving. A will is of no effect until the death of the testator; until then it is said to be ambulatory, depending on his mere volition, whether it shall remain in existence for a single hour. No person has any rights under it, and the moment the testator wills its destruction, he immediately has an interest that it should be destroyed. It not only becomes useless to him but actually injurious, because, in case of sudden death, it would thwart his then wishes as to the disposition of his property. Very slight circumstances may and frequently do produce material changes in testamentary dispositions; and although I should place very little reliance upon it as evidence to rebut a legal presumption once established, yet the simple fact stated in the preliminary testimony of James Brown, that Mrs. Ayres went from Brunswick to Poundridge to watch by the pillow of her aged dying parent, may have been sufficient to change the whole current of his affections, and have induced him to destroy the will so that she might receive a child's portion of his property.

Legal presumptions are founded upon the experience and observation of distinguished jurists, as to what is usually

found to be the fact resulting from any given circumstances, and the result being thus ascertained, whenever such circumstances occur, they are *prima facie* evidence of the fact presumed; and I have no doubt that five wills, made with all due formality, have been destroyed by the testators either in secret, or when no one was present to be a witness to prove the fact, to where there has been one destroyed or suppressed by fraud, or lost by time or accident, before the death of the testator. If this be so, the legal presumption must be directly the reverse of that which was given to the jury as the law of this case; and if we sanction the decision of the judge at the circuit, we may have the devisees under many wills which have been thus rightfully destroyed, calling upon the heirs at law through the medium of our courts of justice to prove that such wills are not in existence; or at least to prove the fact that they were actually destroyed by their ancestors, and have not been fraudulently destroyed or suppressed by themselves.

We are not, however, left without sufficient authority on this subject. We have not, indeed, the advantage of many decisions in our common law reports; the few I have been able to find are in favor of the presumption which is contended for on the part of the plaintiff in error. On the argument we were referred to one from the reports of South Carolina, *Legare and wife* v. *Ashe and others,* 1 *Bay's Rep.* 464. In that case a will duly executed was not found after the death of the testatrix. On an issue of *devisavit vel non* sent into the superior court of common pleas to be tried, Judge Grimke was of opinion that the will not appearing was strong evidence of its having been cancelled by the testatrix. The other two judges admitted that it was *prima facie* evidence that it had been cancelled; but as there was evidence to rebut the presumption, and as it was doubtful from the testimony whether it had not been left with her lawyer, who could not find it among his papers, a verdict was found in favor of the will. Another case of this description came before the high court of errors and appeals in the state of Pennsylvania in 1792, *Lawson* v. *Morrison,* 2 *Dall. Rep.* 286. In that case the testatrix made a will in 1775, and

in 1779 she made another, by which she in terms revoked the first; but the same was left in the hands of her lawyer uncancelled. The last will was delivered to the testatrix about ten days before her death, and was not seen or heard of afterwards. It not being found at her death, the register presumed it was cancelled by the testatrix and decided that the will of 1775 was thereby revived; and on appeal from his decision the sentence was confirmed by the appellate court unanimously, on the presumption that she had destroyed the last will and had intended thereby to revive the first.

It is in the courts of probate that we must look not only for the cases of this description, but for the rule of presumption founded upon much greater experience, and a far more extensive acquaintance with the subject than can exist among the common law judges. There we find the rule established by a series of decisions perfectly clear and satisfactory, and I do not consider it a valid objection to the authority of these decisions that they have taken place in what are technically called the ecclesiastical courts, which in England have the exclusive jurisdiction over testamentary causes. Whatever may be the name of these courts it is well known that the offices of judge of the consistory court of London, and of the prerogative court of Canterbury, and the court of the Arches have for the last forty years been filled with such men as Sir William Wynne, Sir John Nicholl, Sir Christopher Robinson, Dr. Lushington, and Sir William Scott, the late distinguished judge of the court of admiralty, and that their decisions are constantly reviewed on appeal by a court of delegates composed of judges of the king's bench and common pleas, and barons of the exchequer, as well as of doctors of the civil law. The decisions of those courts, therefore, although such as have been made since the revolution are not binding as authority here, are entitled to the same respect as those of any other courts in Great Britain made since that time, as to any matters within their appropriate jurisdictiions; and since the establishment of regular reports, their decisions exhibit a well digested system of testamentary and matrimonial law, which deserves the attentive examination of every lawyer in this country.

The first case on the question now under consideration, which I have been able to find in those reports, is *Freeman* v. *Gibbons*, which came before the prerogative court of Canterbury in 1793. *2 Hagg. Eccl. Rep.* 328. In that case the testator executed a will on the *first* of December, and died on the *tenth* of the same month. The will was deposited in the bureau of the decedent, but could not be found at his death; and there being no sufficient evidence to rebut the presumption that it was destroyed by the testator, Sir W. Wynne pronounced for an intestacy. In the case of *Baumgarten* v. *Pratt,* which came before the same court three years afterwards, a similar decision was made. *Id.* 329. In the last case the court says: "A draft may be pronounced for; but it must be proved, either that the will remained entire at the death, or, if destroyed in the lifetime, that it was done without the knowledge and approbation of the testator. The presumption is that it was destroyed by the deceased." The same principle was recognized by Sir John Nicholl, in 1812, in the case of *Richards* v. *Mumford,* 2 *Phil. Rep.* 23, where the duplicate of a will was left in the custody of the testator and could not be found at his death. It was presumed to have been destroyed by the testator, *animo revocandi,* and that the duplicate in the custody of a third person was thereby intended to be revoked. The case of *Moore and Metcalf and De la Torre* v. *Moore,* which came before the same court in 1816, 1 *Phil. Rep.* 375, was decided on the same legal presumption. The will in that case was indeed found after the death of the testatrix, but in a mutilated state, having been deliberately cut through in several places by some one, though the contents thereof could still be ascertained. As the mutilated paper was found in the repository of the testatrix after her death, and there was no evidence to fix the spoliation on any other person, the court presumed it was done by the testatrix, *animo cancellando;* and pronounced for an intestacy. In that case Sir J. Nicholl said that the evidence which had been adduced confirmed the presumption of law instead of rebutting it. The sentence was subsequently confirmed on appeal to the court of delegates of which the present chief justice of the king's bench and two

other common law judges were members; but the counsel for the appellant did not even attempt to convince them that the legal presumption was otherwise. In the case of *Loxley* v. *Jackson*, before the same court, in 1819, 3 *Phil. Rep.* 126, the will was last seen in a small box in the bed-room of the deceased, but was not found after her death. The judge said the presumption of law was that the testatrix destroyed the will *animo revocandi;* that the law did not presume fraud, and that the burthen of proof was on the party claiming under the will. Sir J. Nicholl acted on the same legal presumption in 1821, in the case of *Wilson* v. *Wilson,* 3 *Phil. Rep.* 552, and again in *Davis* v. *Davis,* which came before the same court in 1824. 2 *Adams' Rep.* 223. The last case on this point was during the past year in relation to the great *Farquhar estate,* in which our countrywoman, Mrs. Trezevant, is interested as one of the next of kin, *Colvin* v. *Frazer and others,* 2 *Hagg. Eccl. Rep.* 266. In that case the decedent executed his will in India, in duplicate, and gave the bulk of his property for the benefit of the parish schools all over Scotland. He returned to England about the year 1814, and either brought with him one part of the will, or it was sent to him soon after; and the duplicate thereof was left in India, and remained there until his death in 1826. The will was in his possession as late as 1821, but could not be found after his death. The executor having received the duplicate from India, sought to establish it in the prerogative court of Canterbury. The immense amount of property involved in this controversy, about $2,000,000, of course commanded the services of the most distinguished advocates. And the parochial school masters of Scotland, the principal legatees, likewise came in as interveners, and were heard by their counsel, although contrary to the usual practice of the court. After a most able and laborious investigation of the law, and the facts in the case, the judge of the prerogative court again declared the legal rule, that a will traced into the hands of the testator and not found after his death, was presumed to have been destroyed by him, unless the contrary could be shown by the party attempting to set up the will; and that the part remaining in the hands of the testator being revok-

ed, the duplicate was also void. There was a mass of evidence exhibited on both sides, but the fate of the cause depended upon the legal presumption; and the court pronounced for an intestacy. The Scottish school masters afterwards appealed from this sentence to the high court of delegates, but after the preliminary proceedings were had therein they finally abandoned their appeal. *The Parochial School masters of Scotland* v. *Frazer and others, 2 Hagg. Eccl. Rep.* 632. As I can find no case in which a different rule of presumption has been set up, except in the one now before us, and as this rule certainly corresponds with the fact in a great majority of the cases which have come under my own observation, I think the decision of the court below, on this point, should be reversed.

If the court should agree with me on the first point, it becomes useless to discuss the second. Indeed, after arriving at the conclusion that evidence on the part of the defendant was not necessary to satisfy the jury that some person other than the testator had not destroyed the will, and that he had done it, I find it impossible to give any opinion on the second point. Perhaps if there was even a slight presumption that the testator had not done it, the facts that his desk was searched immediately after his death and that the will was not there; the taking a bundle of papers with him when he went to Poundridge; his application there to the same person who had drawn his first codicil to draw another, which was at least sufficient to show a partial change in his testamentary intentions; and that on search among his clothes and papers at that place after his death no will or codicil could be found, that slight presumption would have been destroyed. We are not informed as to the nature or extent of the alterations proposed to be made by the last codicil. If he took the will with him to Poundridge for the purpose of having material alterations made, and found himself overtaken by sickness and approaching his end before that change could be accomplished, it might be very natural for him to conclude it was better to destroy the whole and let his property descend to all his children equally, than to leave a testamentary paper which did not accord with his wishes at that time. If the jury could have drawn such a conclusion—that is, if a,

verdict in favor of the defendant, founded on those facts, would not have been so manifestly against the legal weight of evidence as to make it the duty of the court to grant a new trial; then, as the presumption in this case, whether in favor of or against the destruction of the will by the testator, is merely *prima facie* evidence of the fact, and not an unbending conclusion of law which cannot be rebutted, the counsel should have been permitted to urge those facts to the jury in opposition to the *prima facie* evidence arising from the loss of the will, even if the judge was right on the question of legal presumption. Cases of this kind will seldom be left to be decided on the strength of the mere legal inference without any other circumstances to strengthen or repel the presumption, and whenever other proof is introduced, sufficient to authorize the jury to form a different conclusion, they should be permitted to decide the question, under proper instructions from the court as to the legal inference, arising from any particular state of facts.

I have examined the question before us solely upon the facts as they appeared upon the last trial, and as they are detailed in the bill of exceptions, without reference to what had been proved on former occasions, or offered as evidence and rejected. If there is a new trial in this case, as I think there must be, it is to be regretted that the question as to the admissibility of the declarations of the testator, to repel or to confirm the presumption that the will had been destroyed by him, is not in a situation to be examined and decided by this court before the new trial takes place. The supreme court on a former occasion, 6 *Cowen's Rep.* 382, decided that the circuit judge had correctly rejected evidence of the declarations of the testator, in his last sickness, recognizing the then existence of the will, and directing as to the place where it might be found. As that question could not be raised or argued in this cause, I have not examined the subject sufficiently to have made up a definite opinion thereon; and probably I ought not now to express such opinion, even if I had no doubts on the subject. I will therefore only say, that in the investigation of the other questions in this cause, I have necessarily been compelled to look

into this subject so far as to see there is sufficient doubt as to the correctness of the decision of the supreme court on that point to authorize them to direct a re-argument of the question, if it shall again come before them. The frequent insincerity of testamentary declarations, and the great danger that the real meaning of the testator may be mistaken or misrepresented, when he is no longer able to explain what he meant, must in general render such declarations of but little value as evidence. But they are sometimes received to explain a latent ambiguity, or to ascertain the intention of the testator in case of doubts arising from an equivalent act; and the uniform practice of the English testamentary courts has been to receive such declarations to strengthen or repel the presumption that a will once legally executed, but not found at the death of the testator, had been destroyed by him.

I think the judgment of the court below should be reversed, and that a *venire de novo* should be issued in that court. As the costs in such a case are in the discretion of this court. I think Betts should have his costs of this writ of error, if he finally succeeds in the defence of this suit; but not otherwise, under the particular circumstances of this case.

By Mr. Senator BENTON. As the questions which arise out of the exception to the opinion and decisions of the judge at the circuit present the main points in the case, it becomes our duty to examine and dispose of them in accordance with the principles of the settled law; or, if we cannot find from the evidence of judicial decisions, that the doctrine of legal presumptions in regard to cases like the present is well settled, then must we call to our aid such lights as reason and analogy afford, to assist us in coming to a proper conclusion.

The counsel for the plaintiff in error contends, 1st. That the law arising out of the facts of the case, did not presume the will to have been in existence at the time of the death of the testator, and that parol proof of the contents of the will and codicil, ought not to have been admitted; 2d. That the evidence offered, on the part of Jared Betts, in relation to the

situation of one of the daughters of Benajah Brown and her family, ought to have been admitted; 3d. That the judge at the circuit ought to have permitted the counsel for Betts to argue to the jury that the evidence would justify them in finding that the will had been revoked and destroyed by the testator; and 4th. That the court erred in deciding that the facts proved by the defendant Betts were not sufficient in law to warrant the inference that the will had been cancelled or destroyed, or to justify the jury in finding that the testator revoked his will.

The counsel for the defendant in error insist, 1st. That the execution of the will and codicil, and their contents, were duly proved; and 2d. That the facts proved on the part of Betts were not sufficient, in law, to raise a presumption that the testator had revoked or voluntarily destroyed the will and codicil; and that the court were right in not allowing the jury to be addressed on the subject, as there was nothing for them to pass upon.

It is important to bear in mind that the questions arise upon a bill of exceptions, and that on a motion for a new trial for misdirection, and for admitting testimony alleged to be improper, and for excluding testimony supposed to be proper, the supreme court denied the motion, thereby deciding the rule laid down by the judge at the circuit to be the law.

The rule undoubtedly is, that if the testator lets his will stand until his death, it is his will; but if he does not suffer it to do so, it is not his will. It is ambulatory until he dies. 4 *Burr. R.* 2514. *Dan* v. *Brown,* 4 *Cowen's R.* 490. The will there, as in this case, not being produced, and the last we hear or know of its continued existence being under the power and control, and in the custody of the testator; what is the legal presumption in the absence of all proof of destruction by any other person? The testator had the power of revocation by any other will, or by a codicil in writing, or some other writing declaring the intent, or by burning, cancelling, tearing or obliterating the testament by himself, or by some other person in his presence and by his direction and consent. 1 *R. L.* 365.

Here are three modes of revocation recognized and point-ed out : By an instrument in writing executed with the same solemnity with the will itself ; by the destruction or cancel-lation through the act of the testator himself which needed no witness to constitute its validity ; or when the same act is done by another person, the testator must be present, direc-ting and consenting to it. Suppose a man should delibe-rately take his will and throw it into the fire, would it not be an effectual and legal revocation ? If he can do it, and if the will is ambulatory until death and is proved to be in his possession, what is the presumption in case the will can-not be found ? Is it that he has not done an act which the law declares he may do, and which it is his interest to do when he has changed his mind ?

The case of *Goodright* v. *Harwood, reported in 3 Wils.* 497, *Cowp. R.* 87, and 7 *Brown Par. Cases,* 344, which is relied upon by the supreme court, as bearing out the decision of the judge at the circuit, seems to me, after a careful examination of it as above reported, and also in the report of the same case in the common pleas and king's bench, in *Nare's Rep.* to come short of sustaining the prin-ciple advanced. The questions which came up for deter-mination arose upon a special verdict, and the king's bench in the report of the case in *Nare,* say, " The court must con-clude from the facts found by the jury ; they, the court, can-not find upon the evidence. Presumption is the ground of evidence ; that presumption cannot now be received, as be-ing evidence, and therefore proper to have been found by the jury, not by us." In order the more readily to un-derstand what is the true meaning of the court, it may be proper to consider a moment, the contents of this strange special verdict. The jury found that in 1748 John Lacy duly made a will, and that in 1756 he made another will ; that the disposition made in the will of 1756 was different from the disposition in the will of 1748, but in what par-ticulars is unknown to the said jurors ; but the said jurors say, that they do not find that the said testator cancelled his said will of the year 1756, or that the said defendant (Harwood) destroyed the same ; but what is become of the

said will of 1756, the jurors aforesaid, say they are altogether ignorant. Now I understand the law to be this, in giving judgment upon special verdicts : The court must pronounce the law of the case upon the facts found by the verdict. The court cannot presume, that because one fact is found, another fact exists. No presumption can be admitted in aid of facts found in such a case.

The jury however in that case did find that the testator made a will in which he made a particular disposition of his estate ; and that subsequently he made another will different from the first. There was no evidence that the testator cancelled the subsequent will or that any other person had destroyed it ; and the latter will was not produced at the trial ; in other words, it could not be found. The jury did not find the second will as existing at the time of the testator's death. The judgment of the king's bench and of the house of lords repudiated the idea that the first will was revoked ; the heir at law who sought to establish the invalidity of the former will, attempted to do so by showing a revocation by the latter will and failed ; the court of error expressly holding, that although the testator had made and executed a subsequent will different from the first, although there was no proof of destruction, this afforded no legal ground of presumption that the testator permitted it to stand until his death. And I do not perceive that the opinion of the circuit court, that if the will was duly executed and once an existing will, and in the hands of the testator, unless there be evidence of its having been cancelled or revoked by the testator, the law presumes its continued existence to the time of his death, is well sustained by the doctrine of the case above mentioned. If the law presumed the continued existence of the second will in the case of *Goodright* v. *Harwood,* there certainly then could be no necessity of aiding that presumption by the proof of facts unless there was something in evidence, or some fact found that would destroy the presumption, which is not perceived. If the will continued, it would be *in esse* at the testator's death, I cannot bring my mind to the conclusion that this case sustains the rule attempted to be established. In the case of *Lawson* v. *Morrison,* 2 *Dall.* 237, the question

of presumption arose, whether or not the testatrix had revoked by cancelling or destroying. The court said that the mere circumstance of making a latter will is not virtually a revocation of a former one, the contents being unknown, and it not appearing to have been *in esse* at her death ; but rather the contrary, and that she had cancelled or destroyed it. The only difference which I perceive between the two cases is this : in the case under consideration the contents are proved ; in *Lawson* v. *Morrison*, they were unknown, but neither appear to have been *in esse* at the time when they ceased to be ambulatory. How far this coincidence can have any influence is to be determined mainly from the fact that the circumstance is mentioned and relied upon by the court in connection with want of knowledge of contents. It may be however fairly intended that the court would have come to the same conclusion, even if the contents of the will had been proved.

There are certain settled legal maxims in regard to wills, which it may not be improper to consider. A will is an instrument that can have no force or effect during the life time of the testator. It can have no validity as a testament while the party making it has the power to cancel or revoke ; and if when that power is gone, and the party ceases to be able to exercise volition of mind, the instrument is found executed in accordance with the law, it shall stand. Hence it is said to be ambulatory until the testator dies. It appears to me that upon the assumption of these principles, these consequences must follow ; when the will is in the custody of the testator and cannot be traced out of his hands previous to his death, the presumption is that he destroyed it by such means as he thought proper ; and it not appearing that the same was done by any other person by his direction and consent, being present himself, the same presumption continues. The law does not presume in cases where an act can or may be legally done by one porson, that some other person has done the same act, where such other person would thereby be guilty of a fraud or felony. Thus in *Burtenshaw* v. *Gilbert, Cowp. Rep.* 49, it was held where a will which had been in the possession of the testator and was found upon

ALBANY,
Dec. 1830.

Betts
v.
Jackson.

his death among his papers with his name and seal, and the names of the witnesses cut off, though it was not known at what time such names and seals were cut off, that this was a valid revocation of the will; and this evidently upon the presumption, that the act of cancellation and destruction was done by the testator, because he might do so.

The will in this case having been duly executed and shown to be an existing will in the hands of the testator, in my opinion the lessors must show that the will was in existence at the testator's death, or a jury must find this fact upon testimony submitted to them; or they must prove its destruction by a person other than the testator, before his death, and without his consent; or that it was destroyed since the testator died, before they can be permitted to give evidence of the contents. Upon these grounds, it appears to me, the immediate search for, and failure to find the will upon the death of the testator, goes to establish the fact of destruction by him; but in case a new trial should be granted, this will be a matter for the jury to pass upon, and I shall not, therefore, further consider the point.

The fact of non-production and evidence that on due and diligent search, the will cannot be found, I apprehend, raises a presumption of loss or cancellation, or of destruction by the testator, or destruction by some other person, and in this case it is immaterial which, as the party was entitled to have the matter found by the jury, and it was not permitted by the court.

If I am correct in the foregoing positions, then it follows that the judge at the circuit was incorrect in the subsequent part of the decision, so far as the same is in hostility to the rule of law which I suppose to be the correct one; but where that decision does not come in contact, and is not in hostility, it can have no effect or bearing whatever upon the case.

Admitting, however, for the sake of testing the correctness of the doctrine laid down by the court, that enough had been proved upon the trial to have sustained a verdict for the plaintiff in the court below, upon the question of revocation, and that consequently the parol proof of the contents was admitted upon that ground, it by no means results, that the

party is precluded from addressing the jury upon a question of fact which they are to find.

Most of the minor exceptions and difficulties arising in the cause, grow out of the misconception of the law in regard to presumption; that corrected, there could be no pretence, but the party might properly introduce evidence to destroy, weaken or do away the presumption arising from the proof of a fact. The law does not presume a parent will disinherit his children, and this rule has as strong reasons, in justice and equity, for its application in our day, as it could have had when it was first established.

I forbear a further examination of the question arising in this cause, mainly from the consideration, that having come to the conclusion in my own mind that the judgment of the supreme court ought to be reversed upon the first point, and should this court concur in that opinion, the other questions could not arise upon a new trial. I shall vote for a reversal of the judgment of the supreme court, with the costs of this court to the plaintiff in error. And as the cause comes before us upon a bill of exceptions, a *venire de novo* must be awarded, the costs of the suit in the court below to abide the event.

By Mr. Senator OLIVER. The case now before us has been passed upon by the supreme court, and although I wish to treat the opinion delivered by them with due deference, I am, upon an examination of the case and the authorities which have a bearing upon it, constrained to come to a differen conclusion.

The main question which arises is, whether if a will be duly executed, and once an existing will, and there be no proof of its having been revoked or cancelled by the testator, the law presumes its continued existence to the death of the testator? Before I proceed to an examination of the cases which I think impugn the opinion delivered in the supreme court, it is perhaps proper that I should take a cursory view of the cases cited in that opinion, and upon which the decision appears to be based. The case in 3 *Wils.* 497, arose upon a special verdict; the jury found "that in 1748,

John Lacy made his will, setting it out; but in 1756 the testator made another will, duly attested. The disposition of the will was different from that of the will of 1748, but in what particular was unknown to the jurrors. They further say that they do not find that the testator cancelled or destroyed the will of 1756, but what has become of it they are ignorant." Upon this verdict the court of common pleas came to the conclusion that the will of 1748 was revoked. The cause was afterwards taken to the king's bench on a writ of error, 1 *Cowper*, 88, and the opinion of the common pleas was reversed, upon the ground that as the particular difference was unknown, the will of 1748 was not revoked. The decision of the king's bench was affirmed in the house of lords. 7 *Brown's Par. Cases*, 344, *octavo ed.* I see no force in the remark of Judge Woodworth, "that in the common pleas no objection was made by the counsel, that the non-production of the will raised a presumption against its validity." The counsel undoubtedly conceived themselves confined to the facts found by the jury, for it has long been held that nothing shall be presumed upon a special verdict. 3 *Wilson*, 512. The *dicta* of Judge Nares and Chief Justice De Grey have no bearing upon the case, for the remarks were uncalled for by the facts upon which they were to decide; and general language used by the court must always be understood as referring to the precise question before it. 3 *East*, 123. Besides, in the king's bench the non-production of the will of 1756 was considered an objection to its validity. Lord Mansfield, in delivering the opinion of the court, says: " The jury do not say a syllable as to the second will being *in esse* at the time of the testator's death; the matter seems to me to lie here, but neither party has moved for a *venire de novo ;* if they had, this court, as a court of errors, would have granted it." Why suggest a *venire de novo*, unless for the purpose of having the jury find as to the second will being *in esse* at the death of the testator? The judge again remarks : " The question arises upon a special verdict, but the argument has gone upon presumption only ; and much has been said which would have been very fit for the jury to have considered. The opinion of the court must

ALBANY,
Dec. 1830.

Betts
v.
Jackson.

be guided by conclusions drawn from the facts stated." Is it not manifest from all this that Lord Mansfield considered that it was necessary to the validity of a will, that its existence at the death of the testator should be proved?

In the case of *Johnston* v. *Johnston* 1 *Phillimore*, 466, the will was present in court, and the only question was whether it had been revoked by a subsequent marriage and birth of a child? The case has no resemblance to the one now before us. Upon this review of the cases cited by Judge Woodworth, it appears to me they do not bear him out in the position he has taken.

I now proceed to state my reasons for forming an opinion different from that expressed by the supreme court. I do not deny the law that a will and its contents may be proved and shown by secondary evidence, provided its existence as a good and valid will is proved and its loss shown; but I contend that a paper purporting to be a will is not a good and valid one, till all the requisites necessary to its legal existence are complied with, and till every contingency upon which its validity depends has happened. This leads us to enquire what things are necessary to the perfection of a will; as laid down 1*st Institutes*, 113, they are these: The inception or writing; the publication; and the consummation of it, which last is the death of the testator. If any one of these are deficient, it is no will. Until the death of the testator a will can have no operation, neither can any one claim a right or interest under it: it is under the control of the testator, and can only be considered as resting in intention. Does it not then appear manifest that the death of a testator is as necessary and essential to the validity and legal existence of a will as the delivery of a deed is to the full perfection of a conveyance? and no one would contend that secondary evidence of the contents of a deed should be admitted without proof of delivery. I therefore lay down this position, that a party setting up a will as the evidence of his title must show affirmatively on the trial a valid existing will, uncancelled at the time of the testator's death. That this doctrine is correct, I think is abundantly shown by cases decided. It is a reasonable and convenient rule of law that the party who alleges

the affirmative of any proposition shall prove it. 1 *Stark. Ev.* 376. Keeping this principle in view, let us look at the cases which have a bearing upon this question. In 3 *Phillimore*, 462, the court say : "The will of 1798 cannot be found, and it is to be presumed to have been destroyed by the deceased." In 3 *Phill.* 552, the court say : "But this will of 1817 is not forth coming, it was not found upon the deceased's death, and from the circumstance of its never having been traced into any other hands than the testator's, and that is the last we hear of it, the deceased, undoubtedly upon its execution, put it into his pocket and took it away with him ; it must have been destroyed (as it is to be presumed) by the deceased himself." In 2 *Adams*, 226, it is said : But this instrument is not found upon the death of the testator, and as it was left in his own possession, the legal presumption is that he himself destroyed it, *animo revocandi.* In 2 *Haggard,* 325, the will not being found at the death of the testator, Sir John Nicholl asks, "Who was the person *prima facie* that destroyed it? and upon this there can be no solid doubt; it was in the deceased's possession, it was not to be found at his death, the presumption is that the deceased destroyed it." In 3 *Starkie's Ev.* 1715, it is said : "If a will is proved to have been executed, and which after execution remained in the hands of the testator and cannot be found after his death, a presumption arises that he has cancelled the will, and the burden of proving the contrary is thrown upon the party alleging the contrary." The same doctrine is maintained in the following cases : 3 *Phillimore,* 128 ; *Swinburn, part 7, sec.* 16, *page* 38 ; 1 *Bay's R.* 464; and in *Toller's Executors,* 46, I find this rule laid down : "If the will be lost, two witnesses superior to all exceptions, who read the will, prove its existence after the testator's death, remember its contents and depose to its tenor, are sufficient to establish it." Upon the argument the provisions of the act concerning wills as to the revocation of wills was referred to : I deem it unnecessary to examine that question, as it proceeds upon the assumption of the paper purporting to be a will being produced after the death of the testator.

ALBANY,
Dec. 1830.

Betts
v.
Jackson.

By Mr. Senator TALLMADGE. Was parol evidence of the contents of the will properly admitted? Ought the question of revocation to have been submitted to the jury, and counsel have been permitted to argue on the testimony before them?

The lessors of the plaintiff claimed under the will: it .was therefore incumbent on them to show its validity. No instrument, unless existing unrevoked at the testator's death, can be considered as his will for any purpose. 1 *Powell on Devises*, 529, *n*. If the testator lets his will stand until he dies, it is his will; if he does not suffer it to do so, it is not his will— it is ambulatory until his death. 4 *Burr.* 2514. This rule has at different times received the approbation of the supreme court. 4 *Cowen*, 490. 9 *id*. 208. The formal execution of a will does not prove a valid devise. Proving the execution by the attestation of witnesses and the signature and seal of the testator is only a commencement toward establishing its validity; it is not consummated till death superadds his seal. The very essence of a will, therefore, seems to be its due execution according to the provisions of the statute, and its existence at the time of the death of the testator. Until then, in a legal sense, it is no last will and testament.

How then is a will to be proved? After proof of its due execution, it must be shewn that the testator permitted it to stand till his death. The production of the original is the best evidence of this, although not in all cases conclusive, and sufficiently shews the intention of the testator that it should so continue. If the original be not produced, there must be satisfactory proof of its existence at the testator's death to shew his intention, the same as the original itself would shew if produced. Without this the party cannot resort to secondary evidence. Until then there is no will proved; it has no legal existence; and it would be a solecism in language to talk of secondary evidence of a thing that never existed. The fallacy of the opposite doctrine consists in this, that it *assumes* the existence of the will at the testator's death. Aside from this assumption, there is no proof of its existence or of any intention on the part of the testator that the will, the execution of which has been proved, should stand till his death. Without such intention, which cannot be presumed

from the mere execution of the instrument, there is no will. There is no original, the non-production or loss of which will justify secondary evidence or the admission of parol proof of its contents. The judge who delivered the opinion in the supreme court applies the same principle, as to secondary evidence, to a will and a deed. There is no analogy between a will before the death of the testator, and a deed. The former is ambulatory till his death ; the latter is irrevocable from its execution and delivery. If the testator lets the will stand until he dies, it is then irrevocable also. The analogy therefore does not exist, unless it be shewn that the testator permits the will to stand till his death.

ALBANY,
Dec. 1830.

Betts
v.
Jackson.

The principle laid down by the judge at *nisi prius* is, to my mind, one of dangerous and alarming tendency. According to it, it is no matter what length of time has elapsed since the execution of the will ; even a half century may have passed with an entire change of situation and of circumstances, and still the mere execution of the instrument, in the absence of other proof, is sufficient to establish it as a will by which the estate of this *intestate testator*, if I may be allowed the expression, is to be governed ; when perhaps, the unsuspecting individual may have cancelled in secret his own will, and died in the full belief that his property would share the equitable distribution which the law provides in such cases. Does not the experience of almost every man demonstrate the danger of such doctrine? Who amongst us has not at some period of his life made his will—its execution and its contents known—and afterwards cancelled it, without leaving the least trace of such cancellation? Upon this principle, too, on whom is the burden of proof thrown to shew the revocation of the will by the testator? On the heir, most assuredly. The heir, who knows nothing of the matter, and perhaps has never heard of a will being made. On the other hand, on whom devolves the burden of proof that the testator, in the case now under consideration, permitted the will to stand until his death? The general rule upon the subject is, that which natural reason and obvious convenience dictate—that the party who alleges the affirmative of any proposition shall prove it. 1 *Starkie's Ev.* 376. In accordance

with this rule, the supreme court, 6 *Cowen*, 383, say : " As-suming the execution of the will, *and its existence at the time of the death of the testator* to have been established, the evidence of its subsequent loss or destruction was sufficient to let in parol proof of its contents ;" thereby virtually admitting it to be incumbent on the plaintiff below to prove not only the execution of the will, but also its existence at the time of the death of the testator.

Such is, very briefly, my view of the law, as to the evidence necessary in relation to a will lost or destroyed, to entitle a party to give parol proof of its contents ; that the execution of the will not only must be proved, but that there must also be satisfactory evidence of its existence at the death of the testator, or of his intention that it should exist and stand till his death ; that the mere fact of due execution and possession of it by him at some period in his life time is not evidence of such existence or intention.

If, however, the law is otherwise settled by authority, it is the duty of this court so to declare it. This brings me to an examination of a leading case or two on which much reliance seems to have been placed by the supreme court. The case of *Goodright* v. *Harwood, 3 Wils. Rep.* 497, arose in the common pleas, and the jury rendered a special verdict, by which they found, " That in 1748 John Lacy duly made a will, and that in 1756 he made another will ; that the disposition made by the said John Lacy in the said will of the year 1756, was different from the disposition thereof in the said will of the year 1748, but in what particulars is unknown to the said jurors ; but the said jurors say, that they do not find that the testator cancelled his said will of the year 1756, or that the said defendant destroyed the same ; but what is become of the said will, the jurors aforesaid say they are altogether ignorant." The common pleas decided that the will of 1756 revoked the former. On error in the king's bench, *Cowper,* 88, that court held it was no revocation, and reversed the judgment of the common pleas. The judgment of the king's bench was afterwards, on appeal, affirmed in the house of lords. 7 *Brown's Parl. Cas.* 44. The reasoning therefore of *Nares,* justice, and of *De Grey,* Ch. J.

quoted by the supreme court, having been overruled by the lucid opinion of Lord *Mansfield*, is entitled to no weight in the present case. By the verdict in *Goodright* v. *Harwood*, the jury found certain facts. Upon those facts the court was bound to decide; for nothing can be presumed upon a special verdict. The question, therefore, whether the jury from the non-production of the will of 1756, and in the absence of all evidence of its existence at the testator's death, ought not to have presumed its revocation, could not, with propriety, have been raised on a decision of the law as applicable to those facts. Had the defendant moved for a new trial on the ground that the jury should have *presumed* the revocation of the latter will for the want of such testimony, the case would have been analogous to the one under consideration. Lord *Mansfield* observed that the argument had gone on presumption only, and that much had been said which would have been very fit for the jury to have considered, but the opinion of the court must be guided by conclusions drawn from the facts stated. The scope and tenor of his opinion shew that the latter will was not a revocation of the former, not merely because the particulars of the difference between that and the former were unknown, but because the special verdict did not shew it to be *in esse*, and a *subsisting* will at the testator's death. For he says : " In this case the jury do not say a syllable as to the second will being *in esse* at the time of the testator's death. The matter seems to me to lie here." Mrs. Harwood claimed under the will of '48, which was produced. The heir undertook to shew a revocation of that will by one executed in '56, which was not produced, and its contents unknown, except it made a different disposition from the former will. His lordship said : " A revocation must be shewn, and the mode of doing that is by another will. But this is not all ; for he must shew in fact, that it was *revoked* by another will which *subsisted* at the *death* of the testator." The burden of proof was thrown upon the heir in this case, because he set up the second will, and was therefore bound to prove it to be an existing will at the death of the testator. The same rule applies to either party setting up and claiming under a will.

10 *Johns. R.* 358. But the special verdict did not find this fact, and for that with other reasons it was held no revocation. This case, therefore, so far from impugning the principle with which I set out, in my judgment establishes it.

Nor does the case of *Johnston* v. *Johnston,* 1 *Phillimore,* 446, sustain the position for which it is cited ; it is not analogous. There the will was present in court, and the question was, whether it had been revoked by the birth of children combined with other circumstances. It is true that Sir *John Nicholl,* who delivered the opinion of the court, observed : " The general rule certainly is, that a will once executed, remains in force, *unless revoked* by some act done by the testator, *animo revocandi,* such as burning, cancelling, making a new will and the like." The question of revocation is one of evidence. If the party claiming under the will produces it, it is proof that it has not been revoked ; or in case of loss, if he shew its existence at the time of the testator's death, it is also evidence that he did not revoke it. But if the will is proved to have been previously in the possession of the deceased, and is not found upon his death, and no suspicious circumstance to implicate any other person in its destruction, the law presumes the testator destroyed it *animo revocandi.* This principle has frequently been ruled and recognized by Sir *John Nicholl,* as well as others. 3 *Phillimore's Rep.* 128, 452, 552. 2 *Adams' Rep.* 226. 2 *Haggard's Eccl. Rep.* 325. 3 *Starkie's Ev.* 1715. 1 *Bay's Rep.* 464. *Cowper,* 49. *Swinburne,* 538. 1 *Powell on Devises,* 595, *note* 9.

It was urged, on the argument, that from the peculiar constitution of the ecclesiastical courts, there was a motive to exclude the proof of wills, and therefore their decisions should be received with great caution. However much ancient superstition and prejudice may have detracted from the weight and authority of these courts, it cannot be denied that for many years past, their decisions have been able and learned, and have been cited in the common law courts in England with much approbation where the subject matter was the same. In 1 *Powell on Devises,* 539, *note,* it is observed that although our courts are not bound by the decisions of the ecclesiastical courts regarding the probate and personal prop-

erty, yet where the principles governing the question are not materially different in the respective courts, they are allowed to have weight, not only on account of the respect due to the learned judges by whom they may happen to have been decided, but also on account of the obvious expediency of preserving uniformity of decisions.

From the above view there is no doubt, that under the circumstances of this case, parol proof of the contents of the will was improperly admitted.

It only remains to consider whether the question of revocation ought to have been submitted to the jury and argued by counsel on the testimony before them. If the law be, as laid down by the judge at *nisi prius*, then, of course, counsel could not be permitted to argue against the law to the jury. But however correct the judge may have been in the general principle advanced by him, he seems to me to have altogether misapplied it in the present instance. Judging of this matter by the plain standard of common sense, without puzzling ourselves with legal refinements, it would strike every one, that there was the utmost propriety in submitting this question to the consideration of the jury and in permitting counsel to argue it before them. The law is presumed to quadrate with this standard, and will be found on examination to be in harmony with it. " Where facts are not disputed," says his honor, " the law arising on those facts is to be declared by the court." This is the general principle, and the authorities cited on the argument to sustain it in its application to the present case are such as relate to the power of a court to nonsuit a plaintiff where his proof does not maintain the issue on his part. 13 *Johns. R.* 334. 19 *id.* 159. Where there is a failure of evidence, tending to establish any one essential averment, the court directs the plaintiff to be nonsuited, 1 *Starkie's Ev.* 400 ; but no analogy is perceived between this and the case under consideration. Suppose, after the making of a will, the marriage of the testator and the subsequent birth of a child should be shewn ; this is what the law terms an implied revocation and declares the will revoked. It is a presumption made by the law itself from those facts, and the judge would not permit counsel to argue or

the jury to find to the contrary. But the point in issue in this case, and which the counsel for the defendant below wished to argue and to have submitted to the jury was, whether from the testimony the will had been revoked. The facts to which the judge applied the law were mere evidence to prove the fact in issue, viz. the revocation of the will. It was the peculiar province of the jury, under the advice of the court, to find the fact of the revocation or not, from the evidence before them. From the evidence there was no presumption which could be made by the law itself without the aid of the jury. The error, in my judgment, consists in the misapplication of the term *facts* to testimony, which is adduced to establish the fact in issue between the parties, and which is to be found by the jury. The general rule seems to be, that where there is any legal admissible evidence tending to prove the issue, the effect of that evidence is solely for the consideration of the jury. 1 *Starkie's Ev.* 399. The jury can decide matters of fact only; they may apply the law as delivered by the court. Whenever upon particular facts found, the court, by the application of any rules of law, can pronounce on their legal effect, with reference to the allegations on the record, such inference is matter of law. So, also, whenever the court cannot pronounce on the legal effect of particular facts, and when it is requisite to enable them to do so, that the jury should find some other inference or conclusion, such further inference or conclusion is a question of fact. 1 *Stark. Ev.* 410. But the judge held the evidence *insufficient*, not *irrelevant*. The jury should have been permitted to pass on its sufficiency. Sufficiency cannot, in the nature of things, be subject to legal definition or control. 1 *Stark. Ev.* 399.

The presumption of revocation from the will being in the possession of the testator previous to his death, and not found after, has already been considered. In the present case there is no suspicious circumstance from which it can be inferred that the will has been destroyed by any other than the testator himself; no witnesses were necessary to its destruction. The fact that search was made for the will immediately after his death, and not found, instead of making any thing in its favor, is strong evidence of revocation. This

presumption is innocent as against the testator. The law will not presume fraud, which it must do, if the testator himself did not cancel it. Besides, such presumption would also disinherit the heir; the title of an heir at law cannot be defeated by conjecture, ambiguity, or uncertainty, *Cowper*, 92; neither, in my opinion, should it be defeated by presumption.

It is not my purpose to recount the testimony in this case; suffice it to say, it was of such a nature as ought to have been submitted to the consideration of the jury. Whether it was sufficient to enable them to find the fact of revocation is immaterial to the present enquiry; that was a matter under the advice of the court for their determination.

Great and incalculable mischiefs may arise, on the one hand, from establishing the principles contained in the decision of the supreme court; while on the other, the only mischief to be apprehended is, that the party is left to the will which the *law* has made, by means of our statute of distribution and descents. No reflecting mind can hesitate to choose between them.

My opinion therefore is, that on both points which have been taken in the examination of this case, the judgment of the supreme court ought to be reversed.

It being the UNANIMOUS opinion of the court that the judgment of the supreme court should be reversed, it was reversed accordingly.