# APPENDIX.

---

THOMAS A. RICH and another, appellants,

*vs.*

MARY K. GILKEY.*

Penobscot.   Opinion November 28, 1881.

*Revocation of a will, when valid.*

The destruction of a will by a person not possessing testamentary capacity, is not a revocation of it.   There must be *animus revocandi*, and such person does not and cannot possess an intention, of revocation any more than an insane man can.

And where the destruction of a will by the testator is the effect of the exercise upon his mind of undue influence it is not a revocation of the will.

An appeal from the decision of the judge of probate in the matter of the probate of the will of Sylvanus Rich.

The will was dated April 9, 1872.   In March, 1879, he made a codicil giving his niece, Mary K. Gilkey, the income of ten

---

*This case was heard at *nisi prius*, and the report of it is here inserted because of the great learning employed in the preparation of the opinion, its literary merit and the importance of the question discussed, together with the fact that other members of the court were consulted upon these questions and, having carefully considered them, they concurred in the views expressed by Judge PETERS in all particulars.   Without this, this book has the full number of pages required. —REPORTER.

thousand dollars during her life. On the sixteenth of March, 1880, the testator destroyed this codicil and made another disposing in a different way of the property given by the former codicil in trust for Miss Gilkey. The testator died on the eighteenth of April, 1880. The judge of probate sustained the first codicil and admitted the same to probate.

The cause came on for trial at the October term, 1881, when by mutual agreement the following entry was made :

"Referred to the presiding judge, who may decide all questions upon the merits as affected by considerations of expediency and compromise, including costs, and enter all and any decrees necessary to carry his decision into effect."

The material facts are stated in the opinion.

*A. W. Paine and John Varney*, for the plaintiffs.

*Barker, Vose and Barker*, for the defendant.

PETERS, J. When this cause was referred to me for decision, in view of the fact that the jury trial might be broken off by the sickness of a juror, I hardly comprehended the extent of the duties which have been cast upon me. I had supposed my office would be performed by the recommendation of some sum which the estate had better pay and the other party had better receive, in a spirit of compromise, than to pursue the case to an end upon the strict application of legal principles and a close sifting of all the facts that might be produced in evidence. Had I anticipated that the respective parties would adhere so closely as they have to supposed legal rights, I should not have so readily taken upon myself a self-imposed responsibility. Having, however, examined and considered all the issues of law and fact sufficiently to form as satisfactory conclusions as it is probable I ever could arrive at, I file in the case the following opinion.

There is no doubt that Captain Rich, the testator, destroyed the codicil in favor of Mary Gilkey in his lifetime.

The questions of fact are these : First, Was the testator, at the date of the destruction of the codicil, possessed of testamentary capacity ? Second, If he had testamentary capacity, was he induced to do the act by undue influence ? It would not be

inconsistent to find that a testator was not possessed of sufficient mental capacity to make a will, and also that he was operated upon by undue influence.

The questions of law are : First, Whether, if the codicil was destroyed by the testator, while lacking the possession of testamentary capacity, it can be legally upheld and probated by means of oral evidence? And, secondly, whether the same result follows, if the destruction was induced by undue influence alone.

An examination of the questions of law comes first in the natural order.

I feel clear in the belief that a person who has not testamentary capacity, cannot revoke a will in any manner whatever. He can neither make nor unmake a will. A codicil stands upon the same footing as a will. A will legally made stands until legally revoked. It cannot be revoked by any act of destruction, unless the act is done with an intention to revoke; and a person not having testamentary capacity cannot have an intention to revoke a will; he is legally incapable of it. In such case the burning of the will can have no effect whatever, provided the contents can be clearly and certainly proved by other evidence. The written instrument may be burnt, the surest and best evidence of the will may be thus destroyed, but the will itself, if a draft of it can be proved, outlives the act of destruction, and the testamentary dispositions stand.

This is a common principle in the law, applicable to the loss or destruction of papers and records generally. For instance, A gives B a deed of land. The deed is lost or accidentally destroyed; but the conveyance stands, if the contents of the deed can be proved by satisfactory evidence.

It is said that this opens a wide field for error and fraud, to establish wills upon oral evidence. To my mind, many more frauds would be committible if the contrary rule were admitted. It is upon proof, complete and undoubted, and not upon less than proof, that wills may be orally established, it is to be noticed.

The counsel for the executors contend that, if a will destroyed after a testator's death can be upheld and established by oral

evidence, one destroyed before his death cannot be. I do not concur in this view of the learned counsel. I do not find the distinction admitted by the authorities, excepting, possibly, where the law is so enacted in one or two of the states. Nor do I see the force of any such attempted distinction. I cannot well perceive that the act of wrongfully destroying a will five minutes before death would be valid, and the same act be not valid, if done by the same hand and in the same way five minutes afterwards.

It is said that a wrongful or accidental destruction of a will might take place many years before a testator's death, and in the meantime the testator might become satisfied with the fact of destruction and in his mind ratify the act, and still the instrument be established as his will after his death, if this doctrine be tenable. But the answer to this apprehension of danger consists in the requirement of the law that any person propounding for probate a will destroyed in the testator's lifetime, has upon himself the burden to prove that, notwithstanding destruction, the will continued to be the will of the testator unrevoked up to the testator's death. The presumption would be that the will was destroyed *animo revocandi*, and the burden would be upon the proponent to show, by circumstances or otherwise, that the will was not revoked by the destruction or by a ratification of the destruction while the testator lived.

I think these views are sustained by the great current of authority. The English cases, earlier and later, are that way. The old work on wills by Swinburne, who compiled his book as long ago as during the reign of Queen Elizabeth, gives this exception to the cases where a will becomes void by cancelling or defacing: "Where the testament was cancelled by the testator himself unadvisedly, or by some other person without the testator's consent, or by some other causalty." Jarman, the best authority on wills, English or American, vol. 1, p. 130, says: "The mere physical act of destruction is itself equivocal, and may be deprived of all revoking efficacy by explanatory evidence, indicating the *animus revocandi* to be wanting." He further says: "Thus, if a testator inadvertently throws ink upon his will, instead of sand, or obliterates or attempts to destroy it in a fit of

insanity, or tears it up under the mistaken impression that it is invalid, it will remain in full force, notwithstanding such accidental or involuntary or mistaken act." Mr. Bigelow, the American editor of Jarman's work, in his notes fully approves the doctrine quoted, citing many American cases in its support. The same doctrine is maintained by· Prof. Greenleaf in his work on Evidence, § 681, vol. 2, and notes. Redfield, in his treatise on wills, in many places restates the same rule, and upon page 323 of volume 1, (1st ed.) says: "The soundness of the mind and memory is requisite to the valid revocation of a will, as to its execution. It follows, of course, that the performance of the mere act of tearing, cancelling, obliterating, burning, &c. without the *animo revocandi,* and which could not exist, unless the testator were in his sane mind, could have no legal operation upon the instrument."

In Bacon's Abridgement (vol. 10, p. 546,) it is laid down, that "the destruction of a will, even by the testator himself, does not amount to a revocation, if the testator had not capacity. Though the instrument is not in being, if the contents are known, it can be proved." Mr. Wharton expresses it this way; "Revocation will not be complete unless the act of spoliation be deliberately effected on the document, *animo revocandi.* This is expressly rendered necessary by the will act, and is impliedly required by the statute of frauds."

In Smith's Probate Law, a Massachusetts work of merit, at p. 51, the author says; "It may be that the will was destroyed by the testator in a fit of insanity, or that it was lost, or accidentally or fraudulently destroyed. Such accidental or fraudulent destruction will not deprive parties of their rights under its provisions, if they can produce the evidence necessary to establish the will."

In *Clark* v. *Wright,* 3 Pick. 67, a codicil fraudulently destroyed in the testator's lifetime was established, upon parol proof of its contents, by the Massachusetts supreme court of probate. The same doctrine was affirmed by the same court in the case of *Davis* v. *Sigourney,* 8 Metc. R. 487, and reaffirmed in *Wallis* v. *Wallis* 114 Mass. R. 510. In *Newell* v. *Homer,* 120 Mass. 277, the petitioner was held to prove a destruction of the will after the

the death of the testator, merely because he, in his petition, had so alleged the fact.

The New York cases are in accord with the foregoing cases. In *Smith* v. *Wait*, 4 Barb. 28, it was ruled that if a testator was incompetent to make a will, he was incompetent to revoke a will made before, and that an insane man can have no intent such as is necessary to revoke a will. In *Idley* v. *Bowen*, 11 Wend. 227, it was held that a revocation by burning the will by the testator, could be impeached by showing the incompetency of the testator at the time of the act. *Schultz* v. *Schultz*, 35 N. Y. 653, is an instructive case to the same effect. In *Nelson* v. *McGiffert*, 3 Barb. Ch. R. 158, Chancellor WALWORTH held it was competent to show that a will had been destroyed by a testator when his mind had become so far impaired that he was incompetent to peform a testamentary act.

The case of *Johnson's Will*, 40 Conn. 587, strongly supports the same view. So does the case of *Collagan* v. *Burns*, 57 Maine, R. 449, as far as it goes. Many other cases in the state courts do.

Late cases in the English court of probate are emphatical in the same direction. In one case it is said, "the act done (burning a will) by the testator can in no sense be his act, for he was out of his mind." In another case the court said, "all the destroying in the world without intention will not revoke a will, nor all the intention in the world without destroying; there must be the two." In another case, the famous case involving the will of Lord ST. LEONARDS, decided as late as 1876, the late Chief Justice COCKBURN said, "the consequences of a contrary ruling would be in the highest degree mischievous. To disallow oral proof might lead to the defeating of justice in many, if not in as many, instances as might arise from the court acting upon such testimony." Much more could be profitably quoted from late English cases, in elucidation of this legal question, did these limits allow. The English cases have gone so far as to decide that a revocation of a will by spoliation may be of a conditional character. A testator destroyed a codicil, not knowing that it disturbed a previous will. The court said: "Where there has been

a physical destruction of a testamentary paper, the court has often been called upon to form an opinion as to the intention of the deceased at the time he did the act. In this case we have come to the conclusion that the testator destroyed the codicil with no intention of revoking the will, and that the court should give no more effect to the act than it would do if the testator had destroyed the paper under a mistake as to the instrument he was destroying. It was not done *animo revocandi.*" The following cases will verify the foregoing propositions. *Brunt* v. *Brunt*, L. R. 3 Pro. and Div. 37; *Cheese* v. *Lovejoy*, L. R. 2 P. D. 251; *Sugden* v. *Lord St. Leonards*, L. R. 1 P. D. 154; *James* v. *Shrimpton*, L. R. 1 Pro. and D. 431; *Brown* v. *Brown*, 8 Ell. and Bl. 876; *Powell* v. *Powell*, 1 Pro. and D. (L. R.) 209.

I therefore have no doubt, that a will destroyed by a person not possessing testamentary capacity, is not a revocation of such will. There must be *animus revocandi*; and such a person does not and cannot possess an intention of revocation any more than an insane man can.

As to the question of law secondly stated, namely, the effect of the exercise upon the mind of the testator of undue influence, although at first having doubts about the point, I am of the opinion that the same result follows where the act of destruction is produced by undue influence, as where incapacity exists. There can hardly be a logical difference, whether the act of destruction be accomplished by a testator who has no mind to exercise, or, having a mind of his own, is prevented from exercising it. Insanity takes away testamentary capacity, while undue influence does not allow it to act. There must be *animus revocandi*. In the one case providence prevents it; in the other case it is prevented by the wrongful act of man. In each case the hand of the testator acts; but the mind does not go with the act. The hands survive the head. If the rule were otherwise, the law would allow one man to cancel another man's will without his consent. It must be borne in mind, that, where undue influence is practiced, the testator's will is overpowered and subverted, and the will of another is substituted in its stead. He is not his own master. He does not act voluntarily, for his own volition does not play a

part. Proper influences merely persuade the will, while undue influences take it away. The first are an appeal; the last are an usurping and conquering force. The old tree, forsooth, sends out its life, but the graft incorporated upon it turns it into unnatural fruit.

This is the more apparent from another view of the same facts. A man makes a legal will. In a codicil he undertakes to cancel the will. But if he has not mental capacity, or if he is induced by undue influences to attempt a revocation, the codicil is of no avail, and the will stands unrevoked. Suppose, however, instead of revoking the will by a codicil, the attempt is made to do it by destroying the will. Must not the act in this way be as free and unconstrained as if done in the other way? Does not the same principle apply? If the mind or will of the testator be held in imprisonment by undue influence, can it revoke a will in one way when it cannot in another? Can a testator accomplish by burning what, under the same conditions, he cannot do with pen and ink? I think not. The question in this phase has not so often arisen as in the form first discussed, namely, a want of capacity, but no particular distinction between the two is found in the cases, nor does, in my judgment, a valid distinction exist.

Then comes a question, whether the general or common law is changed by any of our statutes. I think not.

Section 3, c. 74, Revised Statutes, our statute of wills, is this: "A will so executed is valid, until destroyed, altered, or revoked by being intentionally burnt, cancelled, torn or obliterated by the maker, or by some person by his direction and in his presence, or by a subsequent will, codicil, or writing, executed as a will is required to be," &c., &c. This is substantially like the English statute of wills, and similar to statutes in most if not all the American states, and is in precise accordance and consistency with the views already expressed and the cases cited. Nothing can be much plainer. To revoke, there must be an intention to revoke. If a testator has not a sound or sane intention, he has no intention. If his intention is supplanted by another man's intention then legally he has no intention.

But another statute is relied upon as upsetting or qualifying this statute. Section 7, c. 64, Revised Statutes, reads thus: "When the last will of any deceased person, who had his domicile in this State at the time of his death, is lost, destroyed, *suppressed or carried out of the State*, and cannot be obtained after reasonable diligence, the execution and contents thereof may be proved by a copy and the legal testimony of the subscribing witnesses to the will, or by any other evidence competent to prove the execution and contents of a will, and upon proof of the continued existence of such will up to the time of the decease of said testator unrevoked, letters testamentary shall be granted as on the last will of the deceased, the same as if the original had been produced and proved."

The latter statute was first enacted in 1861. The former has existed ever since we were a state. Even if the phrase, "continued existence of such last will," means physical existence, which I do not agree to, even then the two acts are not inconsistent, and do not clash with each other. One would not repeal nor limit the other any more than the other would the one. One would go further in some respects than the other, and the other further in other respects. Each occupies its own ground. The 1861 act allows oral or parol proof of a will not destroyed, but which is merely suppressed or carried out of the State, while the other is silent about such a case. The act of 1861 is declarative and cumulative only, and does not abrogate nor undertake to abrogate any other act. If the act of 1861 had been passed to alter the great body of the law of the world upon this subject matter, its terms would have been more positive and significant. It directly admits "other evidence competent to prove the execution and contents of a will" than the will itself.

But my judgment inclines strongly to the belief, that the phrase, "continued existence of such last will up to the time of the decease of such testator unrevoked," does not mean the continued physical existence of the will. The word "existence" sometimes means a physical and sometimes a legal existence. A will may have a physical and not a legal existence, and *vice versa*, or it may have both. A deed may be destroyed, so as to have

no physical existence, and still have a legal existence, if its contents can be proved. So a will may exist, although the written instrument be destroyed. And oftentimes a will does not exist as a will, although not destroyed. By the statute first quoted, "a will so executed is valid until destroyed by being intentionally burnt." If unintentionally burnt, it is still valid—is still a will—and still has a legal but not a physical existence.

I think the phrase, "continued existence . . . unrevoked," means no more than that the will shall continue or remain *unrevoked*. The statute, in this respect, merely repeats the requirement of the common law, that a person setting up a destroyed will shall show that such will had a continued legal existence down to the testator's death, that is, that the testator continued in the same mind down to the day of his death. The phrase "continued existence" is explained in *Botts* v. *Jackson*, 6 Wend. 173, to mean, that the testator permitted it to stand as his will till his death; and it is there said, "the execution of the will not only must be proved, but there must be also satisfactory evidence of its existence at the death of the testator, or of his intention that it should exist and stand till his death; that the mere fact of due execution is not evidence of such existence or intention." The deduction is that if a will is made and adhered to by a testator till his death, and he desires it to exist, or supposes it to, then it does legally exist till his death, unrevoked, though prior thereto, it has been lost or mislaid, or accidentally or fraudulently despoiled. The writing or script may be gone, but the will remains.

But in either interpretation of the statute of 1861, the conclusions reached will stand. I am happy to add, that I have consulted some of my judicial associates upon these questions, who have carefully considered them, and concur in the views expressed by me in all particulars.

So much for the law of the case, then as to the facts. Here I possess the functions of a jury. In deciding facts which are suitable for the jury-tribunal, I feel a disposition to be somewhat influenced by what I think an intelligent and fair-minded jury, properly instructed, would be likely to do upon the same testimony.

Certain important facts appear to me to be unquestionable, namely: That for Miss Gilkey, the beneficiary under the destroyed codicil, the testator had the fondest and warmest affection. Its depth and strength are disclosed by a continuous stream of evidence in his letters produced, which I think could never have been fully appreciated, had it come merely from the mouth of witnesses. He spoke it, wrote it, acted it. She seemed, partially at least, to fill a void in his heart created by the loss of a dearly loved wife, to whom she alone of all the family about him was related. This affection continued from her childhood to womanhood. It never abated. It baffled all family opposition. He educated and supported her, and seemed desirous to make her dependent upon him for all her wants. His letters held up before her vision the rainbow of promise against want in the future. In consonance with all this, when he found the sun of his life descending, although in full health and strength, unasked by her, uninfluenced by anybody that I can see, with much deliberation, against family wishes, he made this codicil. He took his executors as trustees of the fund, but fortified himself against doubt by adding another trustee. He resolutely adhered to the codicil till his last sickness at least.

Now, after he had lain a month on his death-bed, a very aged man, weighed down and weakened by disease, so far into the sunset of his life that the shadows of its twilight were fast settling over his understanding, surrounded by persons naturally disturbed by the existence of the codicil, with no notice to the beneficiary, with no after-mention of it to her, the affection between her and him lasting till his last sands of life ran out, he destroyed the codicil.

What cause was there for this change which so suddenly came over his mind? I think the inference is irresistible that the act was caused by another or others, whether the influence exerted over his mind was an undue influence or not. What his strength did his weakness would not have repudiated. How much truth in the situation scripturally described: "Verily, verily, I say unto thee, when thou wast young, thou girdest thyself, and walkest whither thou wouldst; but when thou shalt be old, thou shalt

stretch forth thy hands, and another shall gird thee, and carry thee where thou wouldst not."

Nor was it unnatural that the heirs should have unwillingly seen this bestowment upon one not an heir, or that they should have resisted it. Perhaps it would have been unnatural in them if they had not resisted it. Undoubtedly, they did no more than seemed proper to do, looking at the matter from their standpoint. Nor do I, possessing plenary powers under the terms of the reference, feel bound to declare whether there was an undue influence exercised or not, or declare an absolute conclusion one way or the other upon the issues, whether the testator was incapacitated from having a reasonable or intelligent intention of revocation, or whether the will was destroyed by him through some misunderstanding or mistake.

Suffice it to say, that, under all the circumstances and conditions of the case, I deem it expedient to uphold the codicil in favor of Miss Gilkey as unrevoked, and allow it to be probated; allowing to the other side some concessions and considerations therefor.

First of which (concessions and considerations) is, that the last codicil shall also be probated. Logically, perhaps, if the first codicil stands, the second should fall. But as there is no contradiction between the two, except a recital in the last which ignores the first, both may stand. Precisely the same point occurred in an English case, *Robinson* v. *Clarke*, L. R. 2 Pro. D. 269. The court there said: "In a testamentary suit, where the parties have come to an arrangement, under the terms of which the court is applied to, to grant probate of two testamentary instruments, it will do so, provided such documents are not entirely inconsistent with one another." In the *Goods of Hony-wood*, L. R. 2 P. and D. 251, the court thought improper words in the recital of a will could be corrected by an explanation upon the record.

Another concession is, that the taxable costs of the appellee, claimed to be several hundred dollars, shall not be recovered from the estate.

Another concession is, that the estate shall not pay the expense of counsel fees to the appellee, though claimed upon the ground

that the estate should be taxed to pay for the expense of sustaining a codicil which by law should be sustained. But the bill therefor, five hundred dollars, which seems not an unreasonable amount for entire services, shall be paid by the executors and charged to the earnings of the trust estate now on hand.

Or, if both parties should prefer it, I should award as above, and instead of the life annuity, order an absolute conveyance to Miss Gilkey of the five thousand dollars of Boston and Albany stock, together with the earnings of the nine thousand dollars of stocks named in the codicil which have been due and payable since the death of the testator to this time.

Or, I would make any other commutation of the life estate into ready money or absolute property, which the parties may agree to.

And whatever conclusion may be accepted, suitable decrees will be entered accordingly.