(Surrogate's Court, New York County. December, 1899.)

1. WILL—DESTRUCTION—PRESUMPTION.

Where decedent's will could not be found, the presumption that she had destroyed it animo revocandi could only be overcome by direct evidence that it existed at the time of her death; and evidence that she showed a fixed purpose not to die intestate, and that the will was in accordance with her wishes, or of her declarations to others that it had not been revoked, was inadmissible.

2. SAME.

Where decedent's will could not be found, the fact that it existed six or eight weeks before her death was insufficient to overcome the presumption that it was destroyed by her with intention to revoke.

3. SAME—EVIDENCE.

To establish a charge that a will was destroyed after the testator's death, it must be supported by undisputable proof, since it must overcome both the presumption of the innocence of the person charged, and the presumption that the testator destroyed the will with intention to revoke it.

4. SAME—DESTRUCTION BY THIRD PARTY.

Where decedent's will could not be found, and it was not proved to have existed at her death, evidence that her nephew, who would be benefited by her intestacy, had had access to the place where it had been kept, and that, in company with a beneficiary under the will, he had made a diligent search for it immediately after her death, failed to show that he had destroyed the will, and did not overcome the presumption that the decedent had destroyed it with intention to revoke it.

Proceedings to probate a will proposed as the last will of Rachel Lenox Kennedy. Probate denied.

Parsons, Shepard & Ogden, Townsend, Dyett & Levy, and De Forest Bros., for proponents.

Gibson & Stapler and Zabriskie, Burrill & Murray, for contestants.

VARNUM, S. This is a proceeding to establish and have admitted to probate a lost or destroyed will of Rachel Lenox Kennedy. The right to dispose of property by will has always been considered purely a creature of statute, and within legislative control. The sole authority for bringing a proceeding of this character is derived from the following provisions of the Code of Civil Procedure, viz.:

"A lost or destroyed will can be admitted to probate in a surrogate's court; but only in a case, where a judgment establishing the will could be rendered by the supreme court, as prescribed in section one thousand eight hundred and sixty-five of this act." Code Civ. Proc. § 2621. "But the plaintiff is not entitled to a judgment establishing a lost or destroyed will, as prescribed in this article, unless the will was in existence, at the time of the testator's death, or was fraudulently destroyed in his lifetime; and its provisions are clearly and distinctly proved by at least two credible witnesses, a correct copy or draft being equivalent to one witness." Id. § 1865.

It will be seen, therefore, that under the above provisions the requisites to be established and the issues to be determined are substantially as follows: First. Was any such will ever executed in due form of law, and, if so, have its contents been clearly and distinctly proved under the statute? Second. If a will was so executed, and its contents duly proved, was it fraudulently destroyed in the lifetime of the decedent? Third. Was such will in existence at the time of the death of the decedent?

Miss Rachel Lenox Kennedy, a resident of the city of New York, died at York Cliffs, Me., on July 31, 1898; being then 72 years of age, and leaving, her surviving, as her only heirs at law and next of kin, her sister, Mary Lenox Kennedy, and her nephew, H. Van Rensselaer Kennedy, the son of a deceased brother, both residents of the state of New York. Miss Kennedy was buried in the city of New York on the 3d day of August, 1898, and immediately thereafter a search was instituted at her late residence, No. 41 Fifth avenue, by her nephew, H. Van Rensselaer Kennedy, her nearest male relative, and Miss Platt, her friend and companion, for the purpose of finding her will. This search was continued from time to time, and included in its scope all possible places where the will could have been placed by the deceased. All efforts, however, to find such will proved fruitless. The testimony is conclusive that the will was never out of the possession of the deceased, but was always retained by her, and kept in her immediate possession. The last evidence as to this possession is that of Miss Platt, which shows that the will was early in May, 1898, strapped to a small tin box on the shelf of the cedar closet in the bedroom of the deceased, in her private residence. Miss Platt, later in the case, claimed that she saw the will in the same place about ten days prior to the departure of the decedent for York Cliffs, during which time decedent occupied the room in question. A day or two previous to the departure of Miss Kennedy for the country, which took place on June 21, 1898, her maid, Augusta, acting upon her request, brought the tin box from the cedar closet to Miss Kennedy, who was then in her bedroom, and the latter took from the box a number of papers and placed them in a black bag, which was then put in her trunk, which trunk was taken with her to York Cliffs, and there placed in her bedroom and kept locked; the keys remaining solely in the possession of Miss Kennedy until shortly before her death. It does not appear that the will was not among the papers so put into the black bag by the deceased, but there is no proof that it was. It may be noted that the persons conducting the search for the will, Mr. Kennedy and Miss Platt, both ap-

peared on the trial of this action and testified as to the fact of the making of such search, and that no will was found, and that upon their cross-examination no fact was developed tending to prove the actual destruction or suppression of the will. It satisfactorily appears, however, by the evidence, and is not questioned, that the testatrix did execute a will in due form of law on or about the 19th day of March, 1895, and a codicil thereto on November 7, 1897, copies whereof are in evidence (furnished by the counsel of the decedent, who drew them), the correctness of which copies is not disputed. By the terms of this will and codicil the decedent gave to her grandniece and namesake, Rachel Lenox Kennedy, daughter of her nephew, H. Van Rensselaer Kennedy, $100,000; to Miss Platt, her friend and companion, $20,000 and a house and lot at White Plains; to the First Presbyterian Church of the City of New York, $80,000; to the Presbyterian Rest for Convalescents, $40,000; to the Presbyterian Home for Aged Women, the Presbyterian Hospital, the New York House and School of Industry, and the New York Female Auxiliary Bible Society, legacies of from $10,000 to $20,000 each; besides two legacies to personal friends (the president of Princeton University, and the pastor of the First Presbyterian Church) of $10,000 each. All the residue of her estate was given, one-half to her nephew, H. Van Rensselaer Kennedy, and the other one-half to her sister, Mary Lenox Kennedy. The nephew of the decedent, H. Van Rensselaer Kennedy, and Mr. Francis Halpin were named as executors. It will thus be seen that what I have designated as the first requirement of the statute has been fully complied with, namely, the execution of a will has been shown, and the contents thereof clearly proved. With reference to the second requirement, it may be stated that there has been no claim made or testimony offered tending to show that the will was fraudulently destroyed during the lifetime of the decedent. There only remains the question as to whether the third requirement has been complied with, namely, whether it has been shown that the original will was in existence at the time of the death of the decedent. No will having been found, the question now arises as to what is the presumption, and what the proof, as to its existence at the time of the testator's death. Upon the decision of this question depends the success or failure of this proceeding.

The law of this state is well settled that, where no testamentary papers have been found after a careful and exhaustive search, the presumption is that the decedent herself destroyed the will with the intention of revoking it. Collyer v. Collyer, 110 N. Y. 481, 18 N. E. 110; Knapp v. Knapp, 10 N. Y. 276; Schultz v. Schultz, 35 N. Y. 653; Hard v. Ashley, 88 Hun, 103, 34 N. Y. Supp. 583; In re Nichols, 40 Hun, 387; Betts v. Jackson, 6 Wend. 173. And, even in England, where the courts are not controlled, as here, by any positive statutory provisions, the presumption is the same, as shown by the following cases: Colvin v. Fraser, 2 Hagg. Ecc. 266; 3 Phillim. Ecc. 126, 462, 552; 1 Swab. & Tr. 32; 32 Law J. Prob. 202; 36 Law J. Prob. 7; 7 El. & Bl. 886. The only cases where this presumption does not exist will be found to be where the will is clearly

shown not to have been in the possession of the testator at the time of his death. In re Brechtee's Estate, N. Y. Surr. Dec. 1893, p. 709; Hamersley v. Lockman, 2 Dem. Sur. 524; Schultz v. Schultz, 35 N. Y. 653; In re Marsh, 45 Hun, 107. "Legal presumptions are founded upon the experience and observation of distinguished jurists as to what is usually found to be the fact resulting from any given circumstances; and, the result being thus ascertained, whenever such circumstances occur they are prima facie evidence of the fact presumed." Betts v. Jackson, 6 Wend. 173. In the last-named case the court says that it is a fact that, for every will that is publicly destroyed, five wills are secretly destroyed, by the testator. The law will not speculate as to the motives which may have operated upon the testator's mind, either in the direction of intestacy or otherwise. The presumption that the decedent destroyed the will animo revocandi is so strong as to stand in the place of positive proof. The principle that a state of things once shown to exist will be presumed to continue, and that therefore the court should presume that, as in the case of a lost deed, the will remained in existence down to the death of the testator, does not apply to the case of a will. Betts v. Jackson, supra. Bearing in mind, then, this presumption of law, the will must be absolutely held by me to have been destroyed by the testatrix during her lifetime, unless positive and satisfactory proof to the contrary can be produced, sufficient to rebut and overcome that presumption. The learned counsel for the proponents seeks to supply such proof by introducing evidence to show that the character, actions, and declarations of the testatrix were such as to show her fixed purpose not to die intestate; that the will and codicil, when made, were in accordance with the wishes of the testatrix; and that those wishes never changed during her lifetime, so far as known,—and claims that the court must be satisfied that she intentionally destroyed her will. Finch v. Finch, 36 Law J. Prob. 78. He also offered to prove, by declarations of the testatrix to others, that the will was not revoked or destroyed by her. Proponents' counsel also made the direct charge that the will in question had been destroyed or suppressed after the death of the decedent, by some person or persons having access thereto, with the very distinct intimation that the person or persons so referred to were the nephew of the decedent, H. Van Rensselaer Kennedy, named as an executor and a residuary legatee in her said will, and one Duvale, a clerk in his employ, who had also been at one time an agent of the testatrix. Upon the trial I excluded all evidence of any declarations of the testatrix, on the ground that under the law in this state such declarations, where unaccompanied by any act, were not admissible to prove revocation, nonrevocation, or continued existence of a will. Eighmy v. People, 79 N. Y. 546, 559; Waterman v. Whitney, 11 N. Y. 157; Hamersley v. Lockman, 2 Dem. Sur. 524, affirmed in 7 N. Y. St. Rep. 292; Marx v. McGlynn, 88 N. Y. 357; Sanford v. Ellithorp, 95 N. Y. 54; and cases cited in Re Marsh, 45 Hun, 107. And see note in Clark v. Turner (Neb.) 38 L. R. A. 433 (s. c. 69 N. W. 843).

It was contended by the learned counsel for the proponents that

the law in this state was not definitely so settled, and that under certain English decisions, and decisions in other states in this Union, such declarations of the testatrix are admissible, and, when corroborated by circumstances, controlling,—referring especially to the cases of Finch v. Finch (1867) 16 Law T. (N. S.) 269; Sugden v. Lord St. Leonards, 1 Prob. Div. 154. It is true that the English courts have adopted the rules originally established in the ecclesiastical tribunals in England, many of which are in direct conflict with the decisions in this state. Thus, in England it has been held that the presumption of destruction by the testator animo revocandi may be rebutted by evidence tending to show that, under all the circumstances, such destruction is improbable (Lord St. Leonards' Case, supra), while in New York the presumption in question stands in place of positive proof, and the court will not weigh the probabilities of decedent's wishes, or otherwise speculate as to the motives which may or may not have influenced him in the direction of intestacy. Hard v. Ashley, supra; Collyer v. Collyer, supra. In like manner, under the English decisions, declarations of decedent as to destruction of a will are admissible under the rule in the Lord St. Leonards' Case, while in New York such declarations are never admitted. In re Ruser, 6 Dem. Sur. 31; In re Russell, 33 Hun, 271. So, also, in England declarations of testator that he destroyed his will are admissible (Rickards v. Mumford, 2 Phillim. Ecc. 23), but never in this state, except where they accompany the act of destruction. Eighmy v. People, supra; Waterman v. Whitney, supra. It is not, of course, for this court to attempt to substitute in this case, for the law of this state, the law of England, as the former is controlling unless and until it may be changed by our court of highest resort.

As to proponents' other points, it is clearly shown by the testimony that the decedent had been on affectionate and friendly terms with Miss Platt and the other persons named as legatees; that she had for many years been generous, and almost lavish, in her charitable donations to the different charitable and religious institutions named as beneficiaries in said will; and that she had been especially interested in the Presbyterian Rest for Convalescents, the Presbyterian Home for Aged Women, and the Presbyterian Hospital,—that interest being shown, not only in large donations, but in active personal work and participation in their management. To the First Presbyterian Church—her own place of worship, and that of her ancestors—Miss Kennedy must have been a sort of ministering angel; for it appears that when the church was financially embarrassed, and its future in doubt, she contributed the sum of $4,000 per annum for a number of years towards the salary of its pastor. and at the time she made her will she intimated to her lawyer, Mr. Van Cleaf, her desire to continue the same contribution so long as the church continued in its present location, and was conducted upon the same lines. It has also been shown that there was no break or interruption, so far as known, of these relations or views of the testatrix, down to, at, or about the period when she was taken ill, in May or June, 1898. From

these facts the proponents claim that they have established a probability that the decedent did not intend to destroy, and did not destroy, her will during her life, sufficient to rebut the legal presumption settled and established by a long line of decisions in this state,—that where a will was in a decedent's possession and custody, and cannot be found after her death, it will be assumed that it was destroyed by her with intention to revoke it. If we entertain the consideration of the speculations of the proponents' counsel as to probabilities, we must, of course, also consider such speculations of a similar character as are suggested by the counsel for the respondents, namely, that as the persons and societies named as beneficiaries under her will, and to whom she had been generous in her lifetime, had no claim upon her superior to that of those of her own blood, her sister and nephew, her only heirs at law and next of kin, it is probable that in her last illness, and in the closing weeks of her life, her heart turned from the former to the latter, either through affection or family pride, and that she finally determined to better the fortunes of her own family, rather than expend this large additional sum in charity, especially as her estate had diminished greatly in amount. It is also urged that the mere fact that the deceased retained her will in her possession and control is evidence pointing towards the probability that the testamentary purposes therein expressed were not intended to be final, but that she kept the will in her custody so as to have the power to destroy it if she saw fit, and die intestate, or that otherwise she would have followed the usual course of leaving it with her lawyer, or depositing it in some safe-deposit company or bank. But, as we have before seen, it is the recognized law of this state that the court will not weigh the probabilities of decedents' wishes, or otherwise speculate as to their motives, as against a well-settled presumption of law, or accept anything to rebut the latter, other than positive proof. The will must be shown to have existed, as a physical fact, at the time of the death of the testator. The fact of testamentary intentions entertained by the deceased at some time anterior to her death can hardly avail beneficiaries of those intentions, where it must certainly be a matter of conjecture whether or not those testamentary intentions remained unchanged. That a will is ambulatory is the oft-repeated statement. In re Stickney's Will, 161 N. Y. 42, 55 N. E. 396.

With reference to proponents' claim that the testatrix was not on friendly relations with her sister, the evidence introduced by the proponents is sufficient to show more than the fact that their relations were not especially intimate, as is not infrequently the fact between members of the same family; but there is nothing to show that there was any positive breach between them, and that fact the decedent has emphasized by the provision in said will naming her sister, Mary, as one of her residuary legatees. In Keery v. Dimon (Sup.) 37 N. Y. Supp. 94 (affirmed in 153 N. Y. 662, 48 N. E. 1105), Ingraham, J., says:

"I do not think the court is justified in diverting a large sum of money from those legally entitled to it, by allowing a lost will to be proved, except upon

the clearest and most satisfactory evidence of the existence of the will at the time of the testator's death."

The mere fact of the existence of the will six or eight weeks before the death of the decedent will not affect the presumption that it was destroyed by her with the intent to revoke it. In many of the cases the interval which elapsed between the date when the will was last seen or known to be in existence, and the date of the death of the decedent, was much shorter,—in some cases, only a few days. Hard v. Ashley, supra; Betts v. Jackson, supra; Freeman v. Gibbons, 2 Hagg. Ecc. 328.

Finally, the proponents have strongly intimated, if not specifically charged, that the will of the decedent, being in existence at her death, was suppressed, purloined, or fraudulently made away with after her decease, either by the decedent's nephew or his clerk, Duvale, singly or in co-operation. The charge is a serious one, and, before referring to the law, it is better to recall and carefully reconsider the circumstances of the case, and the proof as to the persons against whom this charge is made. A will of the decedent is shown to have been in her possession in her own room in her private residence on or about the 11th day of June, 1898, which room she occupied continuously for about 10 days thereafter, or until her departure for the country on June 21st. About June 18th or 20th certain papers were taken by the decedent from the tin box in which the will was contained, or to which it was attached, and put by her in a small black bag, which was locked in her trunk and taken with her to the country; the keys to the trunk remaining admittedly in her exclusive possession until possibly the last few days before her death. No one outside of servants was with her at her own residence before she left New York, or at York Cliffs, until her death, but Miss Platt, her friend and companion, a beneficiary to a large amount under terms of the missing will, and therefore naturally interested to sustain it. Any of the papers in the possession of the decedent, including the will, were thus susceptible of destruction by her, without any outside knowledge or interference, during the period between June 11th, when the will was last seen by any one, and her death, on July 31st. Seven weeks after the will is shown to have thus been in her exclusive custody and control, the testatrix dies; and after the funeral, in the performance of a plain and imperative duty as the head of the family, and her nearest male relative, her nephew proceeds, in company with Miss Platt, to search for the will in the place where the latter said it was kept, and afterwards, with her and others, in every place where it might reasonably be expected to be found, but, as before stated, without any success. The nephew referred to, Mr. H. Van Rensselaer Kennedy, was the only nephew of the decedent, —the son of her deceased brother; and, having lost his parents early in life, he resided from childhood and until his marriage in the decedent's house, occupying virtually the position to her of an adopted son. It is in evidence that continuously until the time of her death he, conjointly with herself, held the right of access to her box in the safe-deposit vaults, and had a general management

of her affairs. No serious suggestions have been made, or, if made, sustained, that the decedent was not always, and up to the time of her death, in most affectionate and friendly relations with him. In the missing will he was named, not only as one of the executors, but also, with decedent's sister, as one of the only two residuary legatees and devisees. No proof or suggestion has been offered, outside of the present charge of proponents' counsel, casting any reflection upon Mr. Kennedy's character or honorable standing in the community, or on his financial status and responsibility; and it may at least be said that no attempt was made to show that he was a person without means, or in any needy or necessitous circumstances. The charge against him is, then, based only upon the grounds that he had opportunity of access to the will, if in existence at his aunt's death, and that, if no will were found, he would profit materially thereby, as one of her heirs at law and next of kin, both of which propositions are not controverted. The other suspect or alleged co-conspirator is one Duvale. Mr. Duvale acted as private secretary to Mr. Robert Lenox Kennedy, the brother of the decedent, vice president of the Bank of Commerce, and a well-known business man and financier from 1882 until Mr. Kennedy's death, in 1887, and since that time has continued in the same capacity with Mr. H. Van Rensselaer Kennedy. From 1887 to 1895 he also acted as agent or secretary for the decedent, keeping the books of a charitable organization of which she was treasurer, and looking after various affairs relating to her charities, and attending to such matters of her personal business as she intrusted to him. The only apparent ground for any attack upon or suspicion of Duvale is that about 1893, or thereabouts, when acting as agent or secretary for Miss Kennedy, he made certain stock speculations for her, she putting up margins, and he buying and selling at her request and upon her order,—he often advising and she consulting him before making the ventures,—in which speculation, it is claimed by Duvale, he had a verbal agreement with her for an interest. A considerable number of the transactions resulted in profit, but during the panic of 1893 the speculations proved disastrous, especially as a broker holding her collateral failed, and a loss resulted, whereupon the testatrix claimed that Duvale owed her for the moneys lost in margins, and that her securities placed as collateral should be returned to her by him. There was some dispute as to the amount due, but Mr. Duvale seems to have turned over all his own property towards reducing Miss Kennedy's losses, while asserting positive claims to credit for a balance due to him from Miss Kennedy on account of profits. It would seem that Miss Kennedy, like many inexperienced women and men under similar circumstances who enter into speculation and lose, felt very bitter about her losses, and believed, consequently, that Duvale had robbed her, and did not hesitate to say so. But there is no intimation anywhere, beyond such allegations of hers, that there was anything more than an indebtedness on his part to her; and at no time has any charge been made through Mr. Van Cleaf, Miss Kennedy's lawyer, who had charge of the claim against Duvale, either in his

statements or letters or testimony, of any misappropriation of funds or securities by Duvale. In fact, it is in evidence that when Mr. Van Rensselaer Kennedy, after hearing his aunt's charges against Duvale, asked Mr. Van Cleaf if there was, in the latter's judgment, any reason why he should not retain Mr. Duvale in his employ, Mr. Van Cleaf said that there was not, if he had no discretion, but acted in a mere clerical capacity. I am satisfied from the evidence, despite all the claims of proponents' counsel, that Duvale had really no clear opportunity of access to the rooms where the first searches were made, and that thereafter he had no opportunity to have free access to such papers as were admittedly taken from the house by Mr. Van Rensselaer Kennedy; and as to the proponents' claim that Duvale had an interest in suppressing or destroying the will, so as to save himself from prosecution for robbery and embezzlement by Mr. Halpin, one of the decedent's executors, I regard it as only a speculation and assumption, with, as before intimated, no proof to sustain it. Proponents have endeavored to sustain their case by showing that the aged testatrix, during her 72 years of life, had received by inheritance some $1,100,000, and that it now appears that she apparently died leaving only about $400,000, and suggest, as a probability arising therefrom, the inference that the estate during her lifetime must have been thus reduced, either by her nephew or Duvale, through speculation, robbery, or otherwise, and assert that it is a suspicious circumstance that Mr. Kennedy and Mr. Duvale declined to give an accounting as to all of their acts, and as to the proponents' claim that Duvale had an interest in business dealings with the testatrix, and as to what, if anything, they know of the reasons for the diminution of her property during the many years when it was in her possession, and allege that the former has acknowledged that he destroyed all his letters and accounts which came into his possession after her death. As a matter of fact, Mr. Kennedy merely testified that he destroyed his own original letters found among his aunt's papers, but admitted that he had letterpress copies of them, which proponents' counsel did not, however, ask him to produce. Mr. Duvale frankly confessed that he felt that, as he had occupied to Miss Kennedy and members of her family a confidential relation for a number of years, he had no right to testify as to her disposition of her property, and declined to do so, but, on being compelled to answer certain questions, mentioned certain isolated gifts by Miss Kennedy to outsiders, but stated that he could not remember the others. In my opinion, the inference sought to be drawn by proponents' counsel by reason of the diminution in amount of decedent's property is unwarranted. If suspicions and speculations are admissible and justifiable, it is quite as reasonable to assume as probabilities that part of decedent's property was lost in her lifetime, either in speculations, of which it was shown she was fond, or that this most generous and charitable woman expended in lavish donations to charitable or religious organizations in which she was interested, or to some of the many poor and deserving people whom it is known she was always befriending, the greater part of her estate. It is quite possible, also, that before or

at the time of the marriage of her nephew, Mr. Kennedy, who had lived in her house nearly all his life, and had been virtually an adopted son, she made some handsome provision for him out of her property. Mr. Kennedy is not, however, bound in this proceeding to expose his personal affairs and property to the gaze of the world; and, although, as before stated, he has not been asked to, or declined to, furnish copies of his letters and statements rendered the decedent, I hold that there is no such reasonable suspicion against him in this case as would reasonably require him to do so. "To charge a person with the suppression of a will is to charge him with a crime. * * * It is not essential, to constitute slander, that the charge must be of an offense at common law. It is sufficient that the charge, if true, would subject the party slandered to indictment. By the Penal Code it is clear that the words charged a crime. The petitioners are therefore bound to establish the fact of the commission of a crime by the same evidence required in criminal courts." Collyer v. Collyer, 50 Hun, 422, 3 N. Y. Supp. 311. "It is not sufficient to show that a person interested to establish intestacy had an opportunity to destroy the will. He must go further, and show by the facts and circumstances that the will was actually and fraudulently destroyed." Id., 110 N. Y. 481, 18 N. E. 110. The law is well settled in this state that opportunity of access, by those interested in intestacy, to the place where the will is supposed to be, is not sufficient to rebut the presumption arising by reason of the failure to find the will after the death of the decedent. Collyer v. Collyer, supra; Hard v. Ashley, supra; Betts v. Jackson, supra; Knapp v. Knapp, supra; In re Nichols, 40 Hun, 387; Hatch v. Sigman, 1 Dem. Sur. 519.

In Hard v. Ashley the court said:

"Such a destruction would be a crime, and a party is not to be convicted of such an act upon suspicion and surmise, but only by evidence proving it."

In Collyer v. Collyer, 3 N. Y. St. Rep. 135, Cullen, J., said:

"It is not enough to show that there was opportunity for wrong. There must be something tending to show that wrong was done."

In Betts v. Jackson the court says, inter alia:

"Is, then, the presumption a reasonable one that the testator, who had a perfect right to destroy the will, and who had no interest to keep it if he changed his mind as to the disposition of his property. has done the act; or is it more reasonable to suppose it has been done by some other person, in fraud of the rights of the devisees, and by perpetrating a crime which the law abhors?"

In Re Stewart's Estate, 149 Pa. St. 111, 24 Atl. 174, the court, on appeal, says in regard to the disappearance of the codicil, and the opportunity of access by a nephew:

"The law presumes, however, in the absence of proof to the contrary, that it was done by the testator himself. There is nothing, beyond mere suspicion, pointing to any one else. The most that the evidence shows is that some one other than the testator might have destroyed the codicil."

Where, as in the present case, the charge is that the will was suppressed or destroyed after the testator's death, stronger and more definite evidence to rebut the presumption of revocation by the de-

cedent is required, and additional presumption of the innocence of the person charged must be overcome; and the spoliation must therefore be clearly proved by the most stringent evidence, and the proponent must be prepared to support his case by clear and undisputable proof. Thornt. Lost Wills, § 94; Hard v. Ashley, supra. And, if the proof remain doubtful, the presumption of innocence must turn the scale. Wargent v. Hollings, 4 Hagg. Ecc. 245, 260. I therefore find that it is not established by the evidence that Rachel Lenox Kennedy's will and codicil were in existence at the time of her death; and, as the legal presumption that they were destroyed by the testatrix herself animo revocandi is controlling, in the absence of clear and satisfactory proofs to the contrary, I must deny the application of the proponents for the establishment and admission to probate of such will and codicil.

Probate denied.