## In the Matter of the Estate of THOMAS CAREY, Deceased.

Surrogate's Court, New York County, September 9, 1935.

*James I. Cuff*, for the petitioner, Rose Carey Peterson, legatee.

*John M. Crane*, for the proponent and executrix named in the will.

*Michael Muccia*, for the children as special guardian.

FOLEY, S.   There is offered for probate in this proceeding the will of the decedent which was executed on June 19, 1933.   He left surviving a son and a daughter as next of kin.   The son has filed objections to the probate upon the ground that the will was revoked by the testator.   He contends that there was a cutting (the equivalent of a tearing as defined in the statute) of the instrument, whereby the signature of the testator upon the second page of the will was severed from the rest of the instrument and that thereby a revocation by the testator was intended and effected under the provisions of section 34 of the Decedent Estate Law.   Three major phases are presented.

(1) The original will, executed on June 19, 1933, is offered for probate by Bessie A. Schumacher, a niece of the decedent and the executrix named in that instrument.   The validity of its execution

has been conclusively proven. The will as offered for probate consists of the first page and two parts of the second page which were cut by some person at some time subsequent to its execution. It is contended by Mrs. Rose Carey Peterson, the daughter of the decedent and the finder of these documents, that the first page and the top of the second page of the original will were found by her after his death in a location separate and apart from the location of the severed portion of the second page of the will which contained the signatures of the testator and of the three subscribing witnesses. The proponent of the will applies for the admission to probate of the entire instrument upon the ground that it was never legally revoked.

(2) In a previous proceeding for letters of administration Mrs. Peterson, the daughter, applied for letters on the ground that the will of June 19, 1933, was void and that her father had died intestate. The proceeding for letters of administration has been consolidated by appropriate order with the pending probate proceeding.

(3) There is a second instrument, hereinafter referred to as the spurious will, which consists of three typewritten pages to which was appended that part of the second page of the original will of June 19, 1933, containing the signatures of the testator and of the three subscribing witnesses. The latter instrument has been filed in this court but has not been offered for probate. Its alleged authenticity as a will is, therefore, not vouched for by any of the interested parties.

The situation presented is an interesting one because of the circumstances surrounding the finding of the parts of the original instrument, the making of the original will by the testator, and the production of the so-called spurious will.

It appears from the evidence that Mr. Carey, in June, 1933, called upon his attorney, James I. Cuff, for the purpose of drafting a will. Careful instructions as to its contents were given by the client to his attorney. The estate consisted of about $12,000. The bulk of the estate was given in the instrument to his daughter and her children. A nominal bequest of fifty dollars was given to the son, the contestant here, and a similar legacy was given to each of his seven children. Legacies of $2,000 each were provided for two nieces. The will was drawn and executed with the care and precision of an experienced attorney. Mrs. Peterson, the daughter, accompanied her father to the lawyer's office on the day of the giving of the instructions and upon the execution of the will. The execution took place about ten days after the date of the instructions. The original will was delivered to the client and a copy kept in the files of the attorney. Five months later. on November 19, 1933, Mr. Carey died. At the time of the execution of the will and for

some days thereafter, he resided with his daughter, Mrs. Peterson. He left her home for a time and lived at a charitable institution in New York city. He returned to the home of Mrs. Peterson and lived for some weeks with her up to a few days before his death.

Mrs. Peterson testified that on November 23, 1933, the day after her father's funeral, she found a book in the pocket of his trousers which contained the so-called spurious will consisting of four typewritten pages bound together in a blue cover and fastened with staples. The trousers were in a closet in the room occupied by him in her home. One of these pages was the second sheet of the original will. The top of the sheet, which contained the eleventh clause of the will and provided for the appointment of the executrix, had been cut off. The lower part of the sheet had upon it the twelfth paragraph, which sets forth a recommendation for the retainer of Mr. Cuff as attorney for the executrix. It also included the *in testimonium* clause, the signature of the testator and the attestation clause with the signatures and addresses of the three subscribing witnesses. The other three typewritten sheets found by her and bound with the sheet of the original will are entitled, at the top of the first sheet, " Last Will and Testament of Thomas Carey." The cover of the original will was used to bind the sheets together.

A disposition of the estate substantially different from the original provisions of the will is set forth on these three sheets. The provisions indicate draftsmanship by an experienced attorney although the typewriting of the paper was carelessly done. By the terms of this spurious will, the legacy of Mrs. Peterson was increased from $5,000, her legacy in the original will, to the sum of $6,150. The legacy to one of her daughters was increased from $1,000 to $2,000. The share of the son of the testator was raised from $50 to $2,000. But the more important fact is that the legacies to the two nieces, aggregating $4,000, were eliminated in the spurious document. In addition, Mrs. Peterson was substituted as executrix in place of the proponent here, Bessie A. Schumacher, the niece of the testator. Despite the zealous investigation of counsel and of the special guardian for the infant legatees, not a scintilla of evidence or information has been developed as to the origin of the new alleged will. Its draftsman is unknown. Nor is there any evidence whatsoever that the testator consulted an attorney or any one purporting to have a knowledge of the draftsmanship of wills during the period from the execution of the original instrument in June until the date of his death.

If it was intended by some person who would benefit that the three sheets containing these changes were to be annexed to the sheet containing the testator's signature and offered as the last will,

the plan was clumsy and the truth easily discoverable. The testimony of the draftsman of the original will, Mr. Cuff, the attorney, would have revealed the fraud and prevented the admission of the instrument to probate. It is extremely significant in this connection that the four typewritten pages of this instrument were bound together in a blue cover when found, according to the testimony of Mrs. Peterson. It is also significant that the cutting of the second page was carefully done and the staples of the cover of the original will were taken from it and carefully replaced and fastened in the spurious document. To a person ignorant of the law, the paper itself might have had, with the signature and attestation clause, the appearance of a valid will.

On the other hand, it is incomprehensible that the testator himself would have attempted to change his will except in the formal fashion with which he was acquainted, or to have rendered it ineffective by merely annexing to the new draft that part of the original will which contained his signature and those of the subscribing witnesses. He himself had selected a competent attorney to draw the will of June, 1933. His instructions were definite and the entire transaction of execution most deliberate and precise. The inference may be fairly drawn from all the evidence that the unexecuted paper was prepared by some person other than the testator and without any direction or instruction from him whatsoever. Cases have arisen where testators have attempted to alter the name of a legatee or the amount of a legacy after the execution of a will or even to substitute new bequests without the formality of a new execution, but the substitution of an entirely new and different disposition, typewritten on pages, the source of which is undisclosed, is exceptional. Cases have occurred where the spurious nature of the paper or the forgery by the insertion of a new page has been exposed. The testator, although in advanced years and of impaired health, was sufficiently well — up to a very brief time before his death — to have visited his attorney for the purpose of drafting a new will if he desired. There is no adequate indication in the record of any change of intent to make a different distribution of his estate in the few months which elapsed after the signing of the original instrument. No subsequent antagonism to the beneficiaries previously selected nor increased affection for others has been shown.

Mrs. Peterson also testified that she found the remaining sheets of the original will four or five days after the finding of the spurious will. These remaining sheets were found in an unlocked box in a closet in the room occupied by her father. There still remained the first page and the top of the second page of the instrument.

According to her version, the spurious document had been previously found by her in the same closet. The key to the closet was in her possession before the death of her father.

After a careful review of the entire testimony, I am of the opinion that the contestant has failed to prove that the cutting of the original will was made by the testator with the intent to revoke it. The only explanation of the finding of the instrument is supplied by Mrs. Peterson. Her explanation is unsatisfactory and unconvincing. She had access to the original will for a period of some weeks before her father's death. She had further access during the time which he spent at a hospital immediately before his death. She has testified she had possession of the spurious paper for a period of four days after his death. She was directly interested in the outcome because she and her children would substantially benefit by the substitution of the pages of the spurious instrument if they were admitted to probate. The elimination of the legacies aggregating $4,000 to the nieces contained in the original will was an advantage to her family and to her brother. Her testimony is conflicting and incredible. As the trier of the facts I have rejected it.

In *Matter of Parker* (100 Misc. 219, at p. 228) Surrogate ROBERT LUDLOW FOWLER wrote: " It is an established rule in this state and in this court that where a revocation of a will is sought to be established from the simple fact that testator cut, tore or obliterated the text of the script of his will, either in whole or in part, *animus revocandi* must also be established *aliter*."

There is no evidence that the testator himself cut the second page of the will. Under the law it was within his power to revoke the will by cutting or tearing off the signature or by a tearing of the pages of the will. (*Matter of Francis*, 73 Misc. 148.) His sole and exclusive access to the original paper has not been shown, for there was ample opportunity, from the careless manner in which he kept it, to afford easy access to it by other persons.

A somewhat similar situation arose in *Matter of Crouse* (205 App. Div. 135; affd., 238 N. Y. 583). In that case the mutilated will was denied probate by the surrogate on the ground that it had been revoked under section 34 of the Decedent Estate Law. The Appellate Division, Third Department, reversed the surrogate and admitted the will to probate. The Court of Appeals affirmed. The Appellate Division rejected the testimony of the person who had possession of the document after the death of the testatrix. Judge KELLOGG in his opinion refers to the consideration to be given to the inference of the finding of a mutilated will after the death of the maker. He states: " It is true that, in the case of a will destroyed

while in the possession of a testator, or in the·case of the production of a mutilated will known to have been taken in that condition from the papers of a deceased testator, an inference arises that the testator himself destroyed or mutilated his will with intent to revoke it. (*Betts* v. *Jackson*, 6 Wend. 173; *Matter of Kennedy*, 167 N. Y. 163.) The inference results from the fact that ordinarily access to a will and opportunity to destroy it are available only to the testator himself. The inference is evidence ' to the contrary ' which overrides the presumption of continuance. But where the facts are not similar to those related, so that the inference does not arise, then the original presumption prevails."

Here, as in the *Crouse* case, the will was produced in a mutilated condition by an interested person after the death of the testator. Evidence of intent by the writer of the will to revoke the instrument is entirely lacking here. (*Matter of Brewer*, 119 Misc. 741; *Matter of McGill*, 229 N. Y. 405; *Matter of Van Woert*, 147 App. Div. 483; *Lovell* v. *Quitman*, 88 N. Y. 377; *Matter of Parker*, FOWLER, S., 100 Misc. 219; *Matter of Curtis*, 135 App. Div. 745; *Burnham* v. *Comfort*, 108 N. Y. 535.) The entire contents and all the parts of the original will have been accurately established and proven. There are no missing provisions. The three separate sheets offered for probate have been indentified by Mr. Cuff, the draftsman, as the entire original will and its terms have been verified·by comparison with the copy of the will kept by him and received in evidence. There was in my opinion no tearing or cutting by the testator himself or by any person under his direction, with intent to revoke. The inference follows from the evidence that the original will was cut up by some other person and that the spurious instrument was fabricated by that person.

Submit decree on notice admitting the original will, executed on June 19, 1933, in its entirety to probate.